**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 03-1883**

———————————

DAWN M. GALLINA,

Plaintiff - Appellee,

versus

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO,
P.C.,

Defendant - Appellant.

———————————

**No. 03-1947**

———————————

DAWN M. GALLINA,

Plaintiff - Appellant,

versus

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO,
P.C.,

Defendant - Appellee.

———————————

Appeals from the United States District Court for the Eastern
District of Virginia, at Alexandria.  T. S. Ellis, III, District
Judge.  (CA-02-647-A)

———————————

Argued:  September 29, 2004          Decided:  February 2, 2005

———————————

Before WILKINS, Chief Judge, and NIEMEYER and SHEDD, Circuit
Judges.

———————

Affirmed in part, reversed in part, and remanded by unpublished
opinion.  Judge Shedd wrote the opinion, in which Chief Judge
Wilkins joined.  Judge Niemeyer wrote a dissenting opinion.

———————

**ARGUED:** Gregory Lynn Murphy, VORYS, SATER, SEYMOUR & PEASE, L.L.P.,
Alexandria, Virginia, for Mintz, Levin, Cohn, Ferris, Glovsky and
Popeo, P.C.  Annette Kay Rubin, Leesburg, Virginia, for Dawn M.
Gallina.  **ON BRIEF:** Byron L. Pickard, VORYS, SATER, SEYMOUR &
PEASE, L.L.P., Alexandria, Virginia, for Mintz, Levin, Cohn,
Ferris, Glovsky and Popeo, P.C.

———————

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

SHEDD, Circuit Judge:

A jury determined that Dawn Gallina suffered a retaliatory discharge from the law firm of Mintz, Levin, Cohn, Ferris, Glovsky, & Popeo, P.C. ("Mintz Levin") in violation of Title VII of the Civil Rights Act of 1964. Mintz Levin now appeals the district court's denial of its Rule 50 (Fed. R. Civ. P.) motion for judgment as a matter of law on Gallina's retaliation claim. Gallina cross-appeals the district court's grant of Mintz Levin's Rule 50 motion dismissing her claim for punitive damages, as well as the district court's denial of her claim for front pay. For the reasons set forth below, we affirm in part, reverse in part, and remand for further proceedings.[1]

I.

Mintz Levin is headquartered in Boston, Massachusetts, and has offices located throughout the United States.[2] Gallina worked as an associate in the Business and Finance section of Mintz Levin's office in Reston, Virginia. Although based in the Reston office, Gallina worked with attorneys from various offices during the

---

[1]Mintz Levin also argues on appeal that the district court erred with respect to certain jury instructions and trial evidentiary rulings. We have carefully considered these arguments and find them to be unpersuasive.

[2]In this appeal from rulings on Mintz Levin's Rule 50 motions, we view the facts in the light most favorable to Gallina, the non-movant. Babcock v. BellSouth Adver. and Publ'g Corp., 348 F.3d 73, 75 n.1 (4th Cir. 2003).

course of her employment. Gallina was employed at Mintz Levin from October 14, 1999, until she was terminated on March 23, 2001, for alleged poor performance.

Gallina's problems at Mintz Levin began in November 1999, when Mark Wishner, then acting as managing partner of the Reston office, discovered that she has a small child. Wishner became disconcerted about why Gallina had not informed him of her child when she interviewed with the firm. Thereafter, Gallina felt that Wishner began to treat her differently than male associates. For example, Wishner was more collegial and cordial with male associates than he was with Gallina. Wishner used unusually harsh language toward Gallina (e.g., "f--king idiot"),[3] and on at least one occasion he called her a "stupid bitch." J.A. 554. Wishner also spoke with Gallina "about the commitment differential between men and women, how women lawyers have more demands place[d] on them, and [how] it's very hard for them to balance when they have a family." J.A. 554. Additionally, Wishner told Gallina what she regarded as a "cautionary tale" about his prior experience with a female associate who, upon her return from maternity leave, inquired about achieving partnership. J.A. 554. Wishner was "beside himself" that the female associate would make such an inquiry, and the story

---

[3]David Fuentez, a male associate, testified that Wishner never used such an epithet directly toward him, and Wishner could not recall using such harsh language toward Fuentez.

4

left Gallina with the impression that "pregnant women don't make partner." J.A. 555, 635.[4]

In February 2000, while on a trip to the Boston office, Gallina complained about Wishner's behavior toward her to Cindy Deegan, who was the firm's Business and Finance practice administrator. Gallina told Deegan that Wishner was treating her differently because she is female. Deegan referred Gallina to Stan Twarog, a Mintz Levin partner who served as the Business and Finance section manager. Gallina then met with Twarog and repeated her belief that Wishner was treating her differently because she is female. Twarog expressed concern about Gallina's complaint, and he asked her not to file a formal complaint because he felt that the matter could be dealt with informally.[5] Being new to the firm and trying to be a "team player," Gallina trusted that Twarog would deal with the matter in an appropriate manner. J.A. 550.

By May the news of Gallina's complaints to Boston reached the Reston office. Scott Meza, a partner in the Reston office, told Gallina that she had "caused a problem" for, and "embarrassed," the Reston office by complaining about Wishner to the Boston office. J.A. 556-57. Meza told Gallina that "[a]ny dirty laundry that

---

[4]Other female employees at Mintz Levin told Gallina that Wishner had "a pathological view towards women" and "a serious problem with women." J.A. 627, 641.

[5]The record is unclear whether Twarog contemplated an EEOC complaint or intra-office complaint.

there may be in Reston needs to be handled in Reston. You don't need to go to Boston." J.A. 557. During a meeting in July, Meza informed Gallina that she was not perceived as being "as committed" as the other lawyers in the Reston office, and he stated that she needed to decide whether she wanted to be "a successful mommy or a successful lawyer." J.A. 560. Also, Meza reiterated how Gallina had "embarrassed us when [she] went to Boston." J.A. 560.

After her July meeting with Meza, Gallina was upset and concerned with Meza's response to her complaints. Consequently, Gallina met with Christina Gadiano, a female attorney in the Reston office. At this meeting, Gallina discussed her concerns about the treatment she had received and stated her belief that it was because she is female. Gadiano related that during her own pregnancy while at the firm, she had heard Wishner's "pregnant women don't make partner" story. Gadiano also stated that Wishner had made a sarcastic remark to her that "we just had to get you out of here, pregnant and all" before making future hiring decisions. J.A. 522. Gadiano suggested that Gallina speak to Susan Weller, another female attorney that had children. Taking Gadiano's advice, Gallina met with Weller shortly thereafter and expressed her concerns about Wishner's conduct.

In September, Gallina took her complaints of gender discrimination to Joan Howland, the Director of Human Resources for the Boston office. Gallina sought an interim performance

6

evaluation from reviewers in Boston because she believed that some of her Reston evaluations were biased. Later, in October, Howland denied Gallina's request for the interim performance evaluation and advised her to "keep [her] head down and do [her] work." J.A. 565.

In November, David Barmak, a partner practicing employment law, succeeded Wishner as the managing partner of the Reston office. Shortly afterward, Barmak met with Howland to discuss Gallina's "situation." J.A. 872. On January 12, 2001, Barmak withheld Gallina's annual pay increase pending the results of her performance evaluations. The performance evaluations were completed in mid-January. In an e-mail on March 19, Barmak notified Gallina that the performance evaluations had been assembled. On these performance evaluations, all four reviewers from the Reston office gave Gallina negative reviews, while both reviewers from other offices gave her positive reviews. Notably, two of the negative evaluations from the Reston office came from Wishner and Meza. Four days later, on March 23, Barmak terminated Gallina's employment.

Gallina thereafter brought this action against Mintz Levin alleging claims under Title VII for gender discrimination, sexual harassment, and retaliation. Additionally, Gallina asserted a claim under the Equal Pay Act. Gallina sought compensatory damages, back pay, front pay, punitive damages, and reinstatement.

7

Before trial, the district court granted summary judgment in favor of Mintz Levin on Gallina's Title VII claims of gender discrimination and sexual harassment, and her claim under the Equal Pay Act. The case then proceeded to trial on Gallina's Title VII retaliation claim. At the close of the evidence, Mintz Levin moved pursuant to Rule 50 for judgment as a matter of law. The district court denied the motion as to the retaliation claim, finding that credibility issues made this the "quintessential . . . jury case." J.A. 941. The district court granted the motion as to Gallina's claim for punitive damages, noting that she failed to satisfy her burden of showing that Mintz Levin had not acted in good faith. The jury thereafter returned a verdict in Gallina's favor, awarding her $190,000 in compensatory damages and $330,000 in back pay. Mintz Levin then renewed its Rule 50 motion on the retaliation claim, which the district court denied. The district court also denied Gallina's reinstatement and front pay claims.

Mintz Levin now appeals the district court's denial of its Rule 50 motion on the retaliation claim. On cross-appeal, Gallina challenges the district court's dismissal of her punitive damages claim and its denial of her front pay claim. We address these arguments in turn below.[6]

---

[6]We have reviewed Gallina's argument concerning front pay. An award of front pay is an equitable remedy within the district court's discretion. Cline v. Wal-Mart Stores, 144 F.3d 294, 307 (4th Cir. 1998). A district court must temper an award of front pay "[b]ecause of the potential for windfall." Duke v. Uniroyal,

Mintz Levin first argues that the district court erred in denying its Rule 50 motion on Gallina's retaliation claim. We review this ruling de novo. Bryant v. Aiken Reg'l Med. Ctrs, Inc., 333 F.3d 536, 543 (4th Cir. 2003). Under Rule 50(b), our inquiry is whether a jury, viewing the evidence in the light most favorable to Gallina, "could have properly reached the conclusion reached by this jury." Id. (internal quotations omitted). If reasonable minds could differ about the result in this case, we must affirm. Id.

Gallina can prove unlawful retaliation by showing (1) that she engaged in a protected activity, (2) that Mintz Levin took an adverse employment action against her, and (3) that a causal connection links the protected activity and the adverse action. Id. Once Gallina makes this showing, Mintz Levin could defend itself by producing "evidence of a legitimate, non-discriminatory reason for taking the adverse employment action." Id. (internal quotations omitted). The jury must then decide whether the adverse action was actually taken for the proffered reason, or whether that reason was merely pretext for retaliation. Id. In reviewing the district court's judgment, "we examine the full trial record to determine whether sufficient evidence supported the jury's verdict

---

Inc., 928 F.2d 1413, 1424 (4th Cir. 1991). We have reviewed the record and conclude that the district court did not abuse its discretion in denying Gallina's claim for front pay.

on the ultimate question of the alleged retaliatory discrimination." Id. (internal quotations omitted).[7]

Gallina presented sufficient evidence at trial to establish that she engaged in a protected activity. Through Title VII, Congress has forbidden employers to retaliate against employees for engaging in protected activities such as opposing gender discrimination in the workplace. See 42 U.S.C. § 2000e-3(a). "Employees are thus guaranteed the right to complain to their superiors about suspected violations of Title VII." Bryant, 333 F.3d at 543-44. Gallina made such complaints. The jury heard evidence that Gallina complained to at least four superiors at Mintz Levin about her concerns of gender discrimination, lodging most of her complaints after assurances by a partner that the matter would be dealt with informally.

Further, although Mintz Levin contends that Gallina lacked a good faith, reasonable belief that the conduct she complained of violated Title VII, see Peters v. Jenney, 327 F.3d 307, 320-21 (4th Cir. 2003), Gallina's repeated complaints and expressions of concern in response to this conduct demonstrate that she actually believed she was being subjected to gender discrimination. Additionally, Wishner's alleged course of conduct toward Gallina,

---

[7]The burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), is inapposite when the trial has proceeded to completion. Jiminez v. Mary Washington College, 57 F.3d 369, 378 (4th Cir. 1995).

10

viewed as a whole and in the light most favorable to Gallina, was sufficiently serious to show that Gallina's belief of illegal discrimination was reasonable. See Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 192 n. 16 (4th Cir. 2000) (explaining that "[a]ctionable discrimination includes conduct 'because of' the victim's gender, which is broader than conduct of a 'sexual nature'").

Mintz Levin does not dispute that it took adverse employment actions against Gallina. Indeed, Mintz Levin deferred Gallina's pay increase and ultimately terminated her.

Gallina also presented evidence sufficient for a reasonable jury to find that Mintz Levin's pay deferral and firing were the result of her complaints about gender discrimination. After Gallina complained about Wishner's conduct toward her to Deegan and Twarog in Boston, Twarog asked Gallina not to file a formal complaint and assured her that the matter would be dealt with appropriately. Subsequently, Meza explained on two occasions how Gallina had embarrassed the Reston office by complaining about Wishner to the Boston office -- where Gallina had complained about gender discrimination. Further, Meza requested that Gallina bring future complaints to him. Despite these apparent efforts to stifle her attempts to complain of gender discrimination, Gallina continued to complain to Gadiano, Weller, and Howland. Within two months of Barmak's becoming the managing partner of the Reston

11

office, he met with Howland to discuss Gallina's "situation" and deferred her pay increase. Then, only two month's after the pay deferral, Barmak fired Gallina. The jury could have reasonably inferred from this evidence that Gallina's pay deferral and firing were manifestations of Mintz Levin's retaliation against her.

The reasonableness of this inference is buttressed by Gallina's evidence that Mintz Levin had no other valid reason for deferring her pay or terminating her. Gallina presented evidence that on her performance evaluations all four reviewers from the Reston office (including Wishner and Meza) gave her negative reviews, while both reviewers from other offices gave her positive reviews. This evidence supports the inference that, but for the bias of the Reston office, Gallina's work was acceptable to Mintz Levin, and the firm fired Gallina because of her continued complaints of gender discrimination.

We therefore hold that there is sufficient evidence to support the jury's verdict on Gallina's retaliation claim.


III.

We now turn to Gallina's cross-appeal. Gallina argues that the district court erroneously granted judgment as a matter of law to Mintz Levin on her claim for punitive damages. Our inquiry requires that we determine whether the evidence, viewed in the light most favorable to Gallina, would have permitted a reasonable

12

jury to return a verdict in her favor on punitive damages. Anderson v. G.D.C., Inc., 281 F.3d 452, 457 (4th Cir. 2002).

A Title VII plaintiff is entitled to punitive damages if her employer engaged in intentional retaliation "with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1). This standard does not require "a showing of egregious or outrageous discrimination," but rather proof that the employer retaliated "in the face of a perceived risk that its actions will violate federal law." Kolstad v. American Dental Ass'n, 527 U.S. 526, 535-36 (1999).[8] However, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." Id. at 545 (internal quotations omitted). Thus, the questions we must answer are: (1) whether Gallina presented sufficient evidence for the jury to find that Mintz Levin, in the course of its unlawful retaliation, perceived the risk of violating Title VII and (2) whether Mintz Levin presented sufficient evidence such that a reasonable jury could

---

[8]For Mintz Levin to be held vicariously liable for punitive damages, Gallina "must also show that the discriminating employee served the employer in a managerial capacity and committed intentional discrimination while acting within the scope of employment." Bryant, 333 F.3d at 548 n.4. In this appeal, there is no dispute that the Mintz Levin employees (including partners at the firm) responsible for Gallina's pay deferral and firing qualified as managerial agents acting within the scope of employment.

only conclude that it engaged in good-faith efforts to comply with Title VII.[9]

We hold that Gallina presented evidence that is sufficient for a reasonable jury to find that Mintz Levin perceived the risk of violating federal law through its retaliation. A reasonable jury could have found that members of a prominent law firm, and especially a law firm with an employment law section in the relevant office, perceived the risk of violating federal law in retaliating against an employee. See Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 443 (4th Cir. 2000) (stating that an employer perceived the risk of violating federal law where that employer required every manager "to attend a week-long training seminar that included education on the federal anti-discrimination laws"); Anderson, 281 F.3d at 460 (finding that an employer perceived the risk of violating federal law where that employer merely knew of an anti-discrimination poster in the workplace). Notably, Barmak was an employment lawyer and was aware of Gallina's complaints of gender discrimination, so he undoubtedly could have perceived the risk of violating federal law. Barmak even admitted

---

[9]We agree with other circuits that have held that it is the employer's burden to establish that it has engaged in good-faith efforts to comply with Title VII. See Zimmermann v. Associates First Capital Corp., 251 F.3d 376, 385 (2d Cir. 2001); Romano v. U-Haul, Int'l, 233 F.3d 655, 670 (1st Cir. 2000); Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 516 (9th Cir. 2000); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 188 F.3d 278, 286 (5th Cir. 1999).

that if a member of a protected class raises complaints, employers should explore the possibility that Title VII issues have arisen. J.A. 884. Thus, a reasonable jury could have found sufficient evidence that Mintz Levin perceived the risk of violating federal law through its retaliation against Gallina.

We also hold that Mintz Levin did not proffer sufficient evidence such that a reasonable juror could only conclude that the firm engaged in good-faith efforts to comply with Title VII. Although Mintz Levin proffered evidence of the existence of a "Sexual Harassment Prevention Training" manual and a contact person to deal with sexual discrimination issues, there was no evidence that Mintz Levin had any specific policy regarding retaliation. The only evidence of any policy was a reference in the "Sexual Harassment Prevention Training" manual, but there was no evidence that anyone at the firm was aware of that policy, nor that it was implemented or enforced. Particularly condemning is the fact that, assuming any policy existed to deal with gender discrimination and retaliation, the policy completely failed Gallina because her complaints of gender discrimination caused her ultimate termination. After considering the conflicting evidence presented, we are not persuaded that a reasonable juror could only conclude that Mintz Levin engaged in good-faith efforts to comply with Title VII. Accordingly, the district court erred by disallowing Gallina's punitive damages claim to go to the jury.

15

IV.

Based on the foregoing, we affirm in part, reverse in part, and remand for consideration of punitive damages.

<u>AFFIRMED IN PART, REVERSED IN PART, AND REMANDED</u>

NIEMEYER, Circuit Judge, dissenting:

On this record, I would reverse the district court's order denying Mintz Levin's Rule 50 motion for judgment as a matter of law because Gallina failed, as a matter of law, to prove that her complaints with respect to Wishner's behavior constituted protected activity. In particular, the evidence on the severity and pervasiveness of Wishner's discriminatory conduct was too weak to support a jury finding that Gallina reasonably believed it to constitute a violation of Title VII. She also failed to prove that Mintz Levin's proffered reason for discharging her -- that she was performing poorly -- was pretextual.

To survive a Rule 50 motion, a plaintiff in a Title VII retaliation claim must present enough evidence that a reasonable juror could find (1) that the plaintiff engaged in a protected activity; (2) that the employer acted adversely to the plaintiff; and (3) that the protected activity was causally related to the adverse action. Beall v. Abbot Labs., 130 F.3d 614, 619 (4th Cir. 1997). And although the employee need not successfully establish an underlying violation of Title VII to succeed on a retaliation claim, for an employee's complaints to constitute a "protected activity," the employee must have held a reasonable belief that the complained-of conduct violated Title VII. Peters v. Jenney, 327 F.3d 307, 320-21 (4th Cir. 2001). Thus, this "protected activity" test contains both a subjective and an objective component.

In this case, no reasonable juror could have concluded, based on the evidence presented at trial, (1) that Gallina <u>actually held a belief</u> that Wishner's conduct violated Title VII or (2) that such a belief would have been objectively reasonable. This alleged belief of discrimination must be assessed in light of the underlying Title VII claim. In this case, Gallina alleged that her complaints were in response to Wishner's treatment of her during the course of her employment. Her allegations most closely resemble a hostile work environment claim, the elements of which are (1) the conduct was done "based on the plaintiff's sex"; (2) the conduct was unwelcome; (3) the conduct was sufficiently "severe or pervasive" so as to alter the terms and conditions of her employment; and (4) the conduct was imputable to her employer. <u>Anderson v. G.D.C., Inc.</u>, 281 F.3d 452, 458 (4th Cir. 2002).

The evidence presented at trial does not support a conclusion that Gallina held a good-faith, reasonable belief that Wishner's conduct was sufficiently "severe or pervasive" as effectively to alter the terms and conditions of her employment. <u>Id.</u> The Supreme Court has noted that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (internal citation omitted). More relevant to the case before us, the Supreme Court has said that a single, isolated

18

incident is insufficient to support a finding that the plaintiff reasonably believed that the conduct was severe and pervasive. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001).

Gallina bases her claim on a handful of isolated incidents: (1) Wishner routinely used foul language with respect to Gallina's work and threatened to fire her if she "f--ked up" assignments. (2) On a couple of occasions Wishner required Gallina to work on weekends even in the absence of a pressing due date. (3) Wishner required Gallina to remain in constant contact with him ("wired") during her vacation. (4) Wishner commented about the commitment differential between men and women. (5) Wishner remarked on the audacity of a woman who returned from maternity leave and immediately asked about making partner. (6) On one occasion, Wisher called Gallina a "f--king idiot" and a "stupid b--ch." And (7) on one occasion, Wishner asked Gallina to make coffee when she worked on a weekend.

With respect to the first three incidents (foul language, working weekends, and remaining "wired"), the record demonstrates that they were not discriminatory, as Wishner treated Gallina's male counterparts in the firm in the same manner. The next two incidents (the comment about the "commitment differential" and the maternity leave story) are analogous to what the Supreme Court referred to as "simple teasing" or "offhand comments" in Faragher, 524 U.S. at 788. Gallina is thus left with only two legitimate

19

instances of discriminatory conduct -- the name-calling incident and the coffee-making incident. Those incidents, however, do not come close to being so "severe or pervasive" as effectively to change the terms and conditions of Gallina's employment.

It is noteworthy that the record contains evidence that, at the time, Gallina did not understand Wishner's conduct to be severe or persuasive, since she nominated Mintz Levin for the "100 Best Companies for Working Moms" list and recommended the firm to her boyfriend. If Wishner's conduct were as severe or pervasive as Gallina claimed at trial, it is doubtful that she would have nominated or recommended the firm. The record does show that Wishner was a very demanding supervisor and often used inappropriate language when communicating with his inferiors, but Gallina has failed to prove that Wishner regularly treated her more severely than he treated male attorneys. Accordingly, I would reverse the district court's denial of Mintz Levin's Rule 50 motion.

In addition, the evidence failed to show that Gallina's discharge was caused by her complaints about Wishner's behavior. Mintz Levin provided extensive evidence of Gallina's inadequate performance and failures as an attorney and contended that her poor performance was the reason that the firm discharged her. Gallina contends that the firm's proffered reasons for discharging her were pretextual. Even though Gallina presented some evidence that she

20

performed well on occasion, she does not provide any response to the incidents in which she was clearly deficient. The firm pointed to four evaluations from attorneys in the Reston office (where Gallina worked) rating her work below-average. It described one transaction, on which she worked, where Gallina failed in her responsibility to file documents creating preferred stock shares, and another transaction where she failed to account for a stock split when preparing an employment agreement for the client. The latter mistake required the firm to rework the deal.

Because the evidence was insufficient to prove two of the three requirements for a Title VII retaliation claim, I would reverse the district court's denial of Mintz Levin's motion under Rule 50 and remand this case to the district court with instructions to enter judgment in favor of the defendants.