933 So.2d 75 (2006)
SPEEDWAY SUPERAMERICA, LLC, Appellant,
v.
Erma DUPONT, Appellee.
No. 5D04-14.
District Court of Appeal of Florida, Fifth District.
May 26, 2006.
Certification Denied July 12, 2006.
*77 Mark L. Van Valkenburgh of Allen, Norton & Blue, P.A., Winter Park, Susan *78 Potter Norton, of Allen, Norton & Blue, P.A., Coral Gables and Brian Koji of Allen, Norton & Blue, P.A., Tampa, for Appellant.
Wayne L. Allen and Adrienne E. Trent of Wayne L. Allen & Associates, P.A., Melbourne, for Appellee.

ON REHEARING EN BANC
SHARP, W., J.
We have considered appellee's (Dupont) motion to rehear en banc. Following further discussion and review, we withdraw our prior opinion dated July 1, 2005, and substitute the following.
Speedway SuperAmerica LLC (Speedway) appeals from a judgment rendered after a jury trial, which awarded Dupont $80,740.54 in damages for her sexual harassment, hostile work environment lawsuit[1] filed against her employer, Speedway. The damages award includes the following items, which were specifically determined by the jury; $88.80 for lost wages, $40,000.00 for mental pain and suffering, and $40,000 for punitive damages.
On appeal, Speedway argues that the trial court erred in not granting Speedway's motion for summary judgment, a directed verdict, or a judgment notwithstanding the verdict, for two reasons: (a) the record and evidence did not establish that the misconduct was directed at Dupont because of her gender, and (b) the record and evidence did not establish that the conduct was so severe or pervasive that it established a hostile work environment which was sufficient to alter the terms and conditions of Dupont's employment, as required under controlling federal case law.
Speedway also asserts it was entitled to a directed verdict or JNOV, because the record established, as a matter of law, that it took prompt remedial action to adequately address Dupont's complaints when its management level employees were informed of Dupont's charges against a co-worker, Coryell. Specifically, Speedway contends that testimony about Dupont's complaints to Ruben in mid-March 1997 should have been excluded, because Ruben was not a supervisor or manager.
Finally, Speedway contends that Dupont's recovery should be reduced below to $75,000, because after Speedway removed the case to federal court, Dupont successfully obtained a remand to state court on the ground that less than $75,000 was in controversy. It also contends that the conduct of Speedway's managers and supervisors established in this record was not sufficiently egregious to support a punitive damage award. We affirm in all regards.
Florida's standard for appellate review of whether a trial court erred in failing to grant summary judgment is the same as the standard utilized by the trial court. To be entitled to a summary judgment, a party moving for summary judgment must conclusively demonstrate the nonexistence of an issue of material fact, and the court must draw every possible, reasonable inference in favor of the party against whom the summary judgment is sought.[2] This is a difficult bar to reach for a moving party and it is meant to be so. Florida has a *79 long-standing policy favoring jury trials and determinations on the merits.[3] This policy is expressly incorporated in section 760.11(5), which provides that in civil actions brought under this chapter, "[t]he right to trial by jury is preserved in any such private right of action in which the aggrieved party is seeking compensatory or punitive damages and any party may demand a trial by jury."
At the two hearings below on Speedway's motions for summary judgment, it conceded Dupont had established a basis for a hostile work environment case under section 760.10, by the statements in her affidavit in opposition to the motions. But Speedway argued that Dupont's affidavit was defeated by contradictions and admissions in her deposition. Both trial judges who heard these motions pointed out that the deposition was not in the court file and that Speedway had not filed a motion to strike the affidavit. Thus we do not address this issue further.
With regard to directed verdicts and JNOV's, the test used by Florida trial courts, as well as appellate courts, is whether the verdict is [for JNOVs] or would be [for directed verdicts] supported by competent, substantial evidence. See Irven v. Department of Health and Rehabilitative Services, 790 So.2d 403 (Fla. 2001); Russell v. KSL Hotel Corp., 887 So.2d 372 (Fla. 3d DCA 2004); Natson v. Eckerd Corp., Inc., 885 So.2d 945 (Fla. 4th DCA 2004); Fast Laundry II v. Gray, 861 So.2d 81 (Fla. 3d DCA 2003); Jackson County Hospital Corp., v. Aldrich, 835 So.2d 318 (Fla. 1st DCA 2002); Cecile Resort, Ltd. v. Hokanson, 729 So.2d 446, 447 (Fla. 5th DCA 1999).
In Scott v. TPI Restaurants, Inc., 798 So.2d 907 (Fla. 5th DCA 2001), this court stated:
[A] motion for directed verdict should be granted only if no view of the evidence could support a verdict for the non-moving party and the trial court therefore determines that no reasonable jury could render a verdict for that party. . . .
When considering a motion for directed verdict, the trial court is required to evaluate the evidence in the light most favorable to the plaintiff and every reasonable inference therefrom must be indulged in the plaintiff's favor. . . . If there are conflicts in the evidence or different reasonable inferences may be drawn from it, then the issue is a factual one that should be submitted to the jury and not be decided by the trial court as a matter of law.
Scott at 908.
In order to address the propriety of the trial court's rulings in denying Speedway's motions for directed verdict and JNOV, we must determine from the record whether Dupont presented competent, substantial evidence to establish a hostile work environment case based on sexual harassment, and draw all reasonable inferences and resolve all credibility issues, in Dupont's favor. Both parties agree that section 760.10, The Florida Civil Rights Act, is patterned after the 1964 federal statute, Title VII, and that the state statutory cause of action has been defined according to federal case law.[4] The state statute *80 provides broader coverage than the federal one, as it includes provisions barring discrimination for age, handicap or marital status, as well as race, color, religion, sex and national origin. However its general language, which is applicable to this case, follows that of the federal statute:
(1) It is an unlawful employment practice for an employer:
(a) To discharge or fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap or marital status.
From this general language, the federal courts have established the required elements that a party claiming discrimination based on gender or sex, must establish to prove a cause of action for sexual harassment against an employer, when the harassment is perpetrated by a co-worker (as opposed to a supervisor or manager), and creates a hostile work environment. They are:
1. that he or she belongs to a protected group;
2. that the employee has been subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;
3. that the harassment must have been based on the sex of the employee;
4. that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and
5. a basis for holding the employer liable.[5]
See Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir.1999). See also Johnson v. Booker T. Washington Broadcasting Service, Inc., 234 F.3d 501 (11th Cir.2000); Breda v. Wolf Camera & Video, 222 F.3d 886 (11th Cir.2000); Dees v. Johnson Controls World Services, Inc., 168 F.3d 417 (11th Cir.1999); Ellison v. Brady, 924 F.2d 872 (9th Cir.1991).
Speedway primarily contends that the fourth and fifth elements of Dupont's cause of action were not established. The jury was specifically instructed on all of the elements of this cause of action and found in Dupont's favor on each element. Thus, to determine whether there was substantial, competent evidence to support the jury's verdict, we must examine the record.
Dupont testified that she applied for a job as a cashier/store clerk in a Speedway store, in September 1996. She was hired by Barbara Bressner (Bressner), the store manager, who trained her. Dupont's first assignment was to work the less desirable shift, 11:00 p.m. to 7:00 a.m., an all night shift. Dupont worked alone on this shift, in the locked store, had little customer interaction, and did primarily store cleaning and housekeeping chores. There were two other work shifts; 7:00 a.m. to 3:00 p.m., and 3:00 p.m. to 11:00 p.m., which involved a lot of customer contact and working with at least one other co-worker, and from time-to-time, the manager or assistant manager.
In February of 1997, Dupont's shift was changed to the second shift, from 3:00 p.m. to 11:00 p.m. In March, she began working a couple of times a week in the store *81 with Joel Coryell (Coryell), a cashier/store clerk, co-worker. She explained that she soon began experiencing problems with Coryell and that he made her uncomfortable. He would say things to compliment her, but did it in an offensive manner or made ugly gestures, so that she did not perceive his comments as compliments. She tried to ignore him and move to another area of the store to work, but he would follow her.
Dupont became frightened of Coryell and felt he was humiliating her. She would be standing at the register and he would sneak up behind her and put his hands on her. She dodged and ran, but he was a very large person and the space behind the counter at the store was small. If she tried to work in another part of the store, he would follow her and start talking about his sex life. He said he could not sleep; that he needed a girlfriend; he needed a sex life. To discourage him, she gave him dirty looks and tried to ignore him. This made Coryell angry. He would start raging and screaming. He would also throw and slam things. He threw pencils, cartons of cigarettes, clothes pins, keys, whatever was at hand. Dupont said she had to jump out of the way, and that the items often fell within a foot of her. She believed he was the most violent person she had ever met.
Coryell used foul language as well. He called customers stupid, a bitch, a dumb bastard. He called her a stupid bitch and a dumb blond. He told her dumb blond jokes and said things to make her feel humiliated. He referred to women as dumb and stupid. He said she would look good as a biker chick, and she looked "hot" in her Speedway outfit. After female customers left the store, he made remarks like: "I wish I could get some of that" and would make sexual body motions. He rubbed her buttocks once and smacked her buttocks once.
One of their jobs as cashiers was to count the safe. Both had to count it independently. When she was counting, Coryell would stand over her, watching, only two or three inches away. No other employee ever stood over her like that. She felt intimidated and scared and found it hard to concentrate. Coryell would laugh at her, call her a dumb blond, and remark that women can't do anything.
Dupont was subjected to Coryell's behavior every time she worked with him on a typical eight-hour shift, for a span of nine weeks before leaving her job. She first complained to Rosemary "Rosie" Ruben (Ruben), the assistant store manager, in March of 1997. Ruben was in charge of the store's operation when Larry Gelbert, who was then the store manager, was not present. She testified she told Ruben everything that had happened. She expected Ruben to take some action to help her, but no action was taken. Ruben later denied she had been told "everything" by Dupont, but she admitted she was told about Coryell rubbing Dupont's neck and shoulders, and she reported this to Gelbert. Ruben did not recall whether she told Gelbert more than that, although in a written statement she had given earlier, she said Dupont came to her about Coryell "harassing her." Gelbert did not question her further about Dupont's complaints, or question Dupont.
At trial, Gelbert admitted that when Ruben worked the store without him, she was the active supervisor of the store, had authority to act on complaints of sexual harassment and violence, and had a duty to report it to higher management. She received a higher pay than other workers, although she had no express power to hire or fire employees. Work schedules were made up by the managers in advance, but *82 if a change needed to be made while she was in charge of the store, she would make it; i.e., call in other employees. She had sole access to the keys to the store office and directed the employees as to their tasks when the manager was not present.
Coryell's harassment continued unabated. In April he began to get physical. Dupont testified Coryell put his hands on her buttocks. He also rubbed her neck and shoulders and asked if it felt good. He intentionally bumped her as he walked by. Dupont looked for Gelbert to voice her complaints, but he was in Ohio for management training. Bressner filled in for him the week he was away. Dupont testified that in early April she told Bressner all of what was happening and that Bressner said she would report it to Julie Rambo, the District Manager. Apparently she did, but neither considered it sexual harassment. Bressner admitted she had not asked Dupont for any details because she was only a fill-in manager for the store at that time. Rambo testified she thought it was a personality conflict and she did not make any further investigation. No remedial action was taken.
The harassment continued and worsened, with Coryell grabbing Dupont's wrist and then pulling her body against his. At trial, Gelbert admitted those acts constitute sexual harassment. When Gelbert returned to the store following his training course in early May, Dupont reported all of Coryell's conduct to him "from the get-go," although Gelbert minimized at trial what she had told him.
Gelbert testified he had not been told anything about Coryell's conduct by Ruben, Rambo, or anyone else, and said he was surprised when Dupont told him of her difficulties with Coryell. In May 1997, immediately following his conversation with Dupont, he talked with Rambo. At the trial, Gelbert testified that Rambo did not tell him she had received prior complaints from Dupont about Coryell from Ruben or Bressner. He testified that they decided to change the work schedules so that Dupont would not work any shifts with Coryell. He explained that to Dupont, who accepted it on the understanding she would not have to work again with Coryell.
Gelbert said that he talked to Coryell about not acting in an intimidating way towards other employees because of his size, but he did not use the words sexual harassment, did not discipline him in any way for his conduct towards Dupont, did not put anything in Coryell's file in the form of a warning or reprimand, and did not investigate Dupont's complaints. Nor did he ask Dupont for a written statement. In fact, he recommended Coryell for a management position. Gelbert also denied receiving any other complaints from other employees about Coryell even though there was other testimony that he had.
Coryell's conduct toward Dupont did not stop after the work-shift change took place. Dupont was placed back on the less desirable 11:00 p.m. to 7:00 a.m. shift, and Coryell was left on the more desirable shifts. However, occasionally their shifts would overlap. Dupont testified that Coryell would hang around after the other employees left and stay longer than needed. Coryell would intimidate Dupont by hovering over her, saying she was not counting the safe correctly, and calling her a stupid, dumb blond. On one occasion, after the shift change, Dupont was working with Ruben. Ruben told Dupont she was going to call in Coryell to work the balance of the shift because she needed to make a bank deposit and there had to be two employees in the store at all times. Dupont begged her not to do that, and she told Ruben that she was afraid of Coryell and did not want to be left alone with him. *83 According to Dupont's testimony, Ruben said that Dupont had to stay and that if she left she would be fired. No harassment happened during that shift, but Dupont was frightened and she was constantly looking over her shoulder.
When Dupont called to get her schedule for the next week's work, an employee told her she was scheduled to work a 3:00 to 11:00 shift with Coryell. She called Gelbert and complained about Coryell hanging around too long on shift changes, about Ruben calling Coryell in to work part of a shift with her, and about her being assigned to work a shift with Coryell the next week. She testified Gelbert responded that he could not help it; it was just how the schedule worked out. He said that had he been Ruben, he would have called Coryell to work also. Dupont quit, saying she was too tense and nervous to work at the store under those circumstances. She testified she felt she had no choice.
Dupont also testified that due to the harassment she experienced she was not as friendly with customers, particularly males. She could not pay attention to her job while trying to figure out what Coryell was doing. She made mistakes counting the safe, she could not sleep and was nervous. She saw a doctor, who prescribed Prozac. Coryell's treatment of her affected her social life and her relationship with her husband. She testified that for the first time in her life she had a fear of males.
Dupont stated she had discussed her problems with a co-worker, Linda Ford, in April or May of 1997. Linda confirmed that she had had similar experiences with Coryell. He had brushed against her breasts a dozen times, came up behind her and massaged her shoulders and the back of her neck. She testified he had a habit of accidentally, "on purpose," brushing up against her body and making it out to be an accident. She testified she complained to Gelbert about this behavior before Dupont quit. She also told him she did not want to work with Coryell. Coryell had had too many accidents brushing up against her, and she was afraid of him and felt he was a time bomb waiting to explode. Ford confirmed Coryell had a bad temper and slammed things around the store. He also commented on female customers having nice derrieres. Gelbert changed Ford's work schedule so as to avoid her working with Coryell, before he changed Dupont's.
Rambo, the District Manager, testified she and Gelbert remedied Dupont's complaint by agreeing to put Coryell and Dupont on different work shifts. However, she testified this meant working full shifts, not partial shifts. As she put it, the business had to operate, and paths do cross. Rambo testified she did not investigate Dupont's complaints; did not seek a written statement from Dupont; did not speak to Coryell about Dupont; did not seek to view store video tapes; and said she had not been told that Coryell had a similar problem with another female employee.
Speedway had a written sexual harassment policy at the time these incidents occurred, and it was posted on the bulletin board in the store. Dupont claimed she never saw it or read it, nor was she told about it when she was hired. However, she assumed the company had such a policy since all the other companies for which she had worked had sexual harassment policies. Speedway's policy, in essence, provided that an employee experiencing sexual harassment should call a 1-800 number that was posted, to make a complaint, or bring the matter to the attention of a manager or supervisor.

*84 I. SUFFICIENCY OF THE EVIDENCE  HOSTILE WORK ENVIRONMENT DUE TO SEXUAL HARASSMENT.
Although cases brought under Title VII and section 760.10 for sexual harassment, hostile work environment, are fact-specific in the extreme,[6] the federal courts have set out a few guidelines. First and perhaps the most important, federal courts require that the conduct/harassment be more than merely insulting or rude and boorish behavior. These statutes were not intended to be "general civility codes."[7] The required standard is to establish that the conduct/harassment was so severe or pervasive, that it adversely affected the terms or conditions of the employee's employment. The adverse effect on the employee must be subjective, as well as objective.[8] Not only must the employee suffer from the harassment, but it is also required that a reasonable person in the shoes of the employee would likely have suffered from such conduct. The latter is primarily a jury issue, if a minimum of bad conduct on the part of a co-worker or supervisor, is established.
In this case, Speedway contends that sexual harassment did not occur because the physical touching of Dupont's buttocks and body occurred only a few times over the months the two worked together.[9] However, only one instance of physically harassing conduct, if extreme, can constitute a hostile work environment.[10] There are also cases where a few physical and intimate touching or batteries, as were established in this case, when coupled with verbal intimidation, humiliation, and threats of physical violence over a course of time (here continuously over a number of weeks) have been held sufficient to constitute a hostile work environment and appropriate for determination by a jury.[11] Uninvited fondling or groping, as was established in this record, in other contexts constitutes actionable sexual battery, and clearly should not be tolerated in the work place.[12] Further, the court must look at the totality of the course of conduct and not micro-bites of behavior in isolation.[13] Justice O'Conner wrote in Harris *85 v. Forklift Systems, Inc.:
The phrase `terms, conditions or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment . . . when the workplace is permeated with `discriminatory intimidation, ridicule and insult,' . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.
510 U.S. at 21, 114 S.Ct. 367.
In this case, Dupont clearly established she was subjectively damaged by Coryell's conduct. She testified she was unable to competently perform her work because of Coryell. She could not sleep, was nervous and upset, and eventually sought medical help.[14] However, to be actionable, the harassment need not seriously affect an employee's psychological well being or lead him or her to suffer injury.[15] Eventually, when faced with the prospect of having to work with Coryell in the future, Dupont felt she had to leave the job and resign. Whether or not a reasonable person would have been so affected by Coryell's behavior was a jury issue that was resolved against Speedway, by the jury's express finding.
Speedway also contends that the behavior was not sexual, but merely violent and directed at both genders, not just females. However, the evidence shows that the bulk of Coryell's improper behavior was directed at females, and specifically at Dupont. Coryell did not proposition or rape Dupont. However, the evidence at trial, taken in the light most favorable to Dupont, established that she perceived Coryell's remarks, jokes, and physical touching as sexual and that his demeaning and intimidating actions were directed at her because she was female. His verbal abuse confirmed that he both lusted after females and enjoyed demeaning them. Although there is evidence he swore at male customers after they left the store, there was no evidence adduced at trial that he remarked to Dupont or others that he craved their body parts or wanted sex with them, as he did with female customers. In any event, all offensive conduct is not required to include sexual overtures, if the behavior is motivated by hostility towards women because of their gender.[16]
The testimony of another female co-worker, Ford, corroborated that similar harassment/conduct by Coryell, was directed at her as well, shortly before Dupont complained to Bressner. There was no evidence Coryell behaved in such a manner with any male co-worker. Again, the jury was instructed that it must find Coryell's behavior was directed at Dupont because of her gender, and it did so, based on competent and sufficient evidence in the record.
We agree with Speedway that there are a few federal cases that, on facts similar or worse than the ones in this case, have determined there was insufficient sexual harassment to establish a hostile work environment.[17] But there are other cases that reach the opposite result, and which have found that a prima facie case was established on a similar, or even a lesser, *86 factual basis.[18] The two Florida cases which have addressed this issue in the context of section 760.10, Florida Statutes, have held prima facie cases were established on the basis of a similar record of harassment. See Russell v. KSL Hotel Corp.; Natson.
Florida has opted for a strong policy against sexual harassment in the work place. The Legislature passed section 760.10, a remedial statute, directed at this form of discrimination based on gender and it should be liberally, not strictly, construed.[19] Almost every state agency and governmental entity is covered by rules and policies which make the type of conduct engaged in by Coryell illegal and unacceptable in the workplace.[20] For us to hold that Coryell's conduct, as established by this record, is so minimal that it does not constitute a prima facie case of sexual harassment under section 760.10, would weaken and demean the statute's purpose.

II. SUFFICIENCY OF THE EVIDENCE TO HOLD SPEEDWAY LIABLE FOR FAILURE TO TAKE PROMPT AND ADEQUATE REMEDIAL ACTION AFTER NOTICE OF THE HARASSMENT.
The fifth element that a plaintiff must establish in hostile work environment cases is that the employer failed to take prompt and adequate remedial measures, after receiving actual notice or constructive notice of the harassing behavior by a co-worker.[21] If an employer is aware of the sexual harassment and takes no remedial action or inadequate steps are taken to prevent recurrence of the harassment, then the employer can be held liable under section 760.10 for damages; compensatory for lost wages, and mental pain and suffering.[22] Speedway argues that promptly after being notified of Dupont's complaints, it took adequate measures to prevent further harassment by separating the two employees from working together and that as a matter of law, it cannot be held liable.
The answer to whether adequate measures were taken by Speedway, lies partly in when Speedway had notice of Dupont's complaints. Was it in May of 1997 when Dupont reported Coryell's conduct to her store manage, Gelbert; or was it earlier, in March of 1997, when she reported it first to Ruben? The shift changes were done fairly promptly after Dupont complained to Gelbert in May. However, if her March complaints to Ruben were to a "supervisor," the steps taken in May were not prompt.
*87 Based on our reading of the record and the admissions of Gelbert at trial, it appears to us that Ruben was Dupont's "supervisor" when she worked the store with Dupont. Ruben was designated assistant manager, and exercised managerial responsibilities when Gelbert was not at the store. She had the authority and power to direct the work of the other employees at Dupont's level, when Gelbert was not present. She received greater compensation than workers at Dupont's level, and together with Gelbert had sole access to the store office. Gelbert also admitted that Ruben had a duty to report complaints of sexual harassment to her supervisors. Thus, we conclude that the trial court properly permitted the jury to consider Dupont's testimony that she told Ruben "everything" about Coryell's behavior in March of 1997. Pursuant to Speedway's sexual harassment policy, that was sufficient to put Speedway on notice of Coryell's conduct in March.[23]
Speedway also contends that its supervisor and management employees were not told by Dupont that Coryell's behavior constituted sexual harassment. This is a disputed issue of fact. Dupont testified she told her supervisors "everything" from the "get-go." At trial, Bressner, Ruben and Gelbert were unable to recall what Dupont said and minimized what they did recall. This is a classic question of credibility for the jury to resolve.[24]
Another component of this issue is whether or not Speedway took adequate steps to prevent the harassment from continuing.[25] Based on this record, the jury could have determined that Speedway took no steps to do anything about Dupont's complaints until May, despite having received a report by Bressner, the temporary manager, to Rambo, the District Manager in April, and a report by Ruben, the assistant store manager, to Gelbert in March.
Based on this record, the jury could have also found that the remedial steps that were taken in May were inadequate. When Gelbert, the store manager, was told by Dupont about the problems she experienced with Coryell, in late April, he alerted his District Manager, Rambo. They decided to change Dupont's work schedule so she would not work shifts with Coryell. They could have moved Coryell to the less desirable 11:00 p.m. to 7:00 a.m. shift or moved him to another store, but they chose to require Dupont to work that shift. This was improper, in itself, but Dupont did not complain. However, Speedway's remedy to keep Dupont and Coryell separated on work shifts was not adhered to. Dupont was required to work with Coryell when he was called in unexpectedly by Ruben, and Dupont was told by Gelbert that she would be required to work with Coryell in the future, if the schedule worked out that way. Rambo admitted she did not intend that Dupont would never be required to work with Coryell.
Based on the federal case law and reading the record and inferences in favor of Dupont, the jury could have reasonably concluded that Speedway's remedial actions *88 were both inadequate and not prompt. An additional basic failure on the part of Speedway was that it did not investigate Dupont's complaints at any time.[26] None of Speedway's supervisors nor managerial staff took Dupont's written statement or talked with her or the other employees in detail. Although there were store video tapes made daily that stored one week or more of activities, which were kept in the store and were available to possibly corroborate Dupont's description of Coryell's harassing behavior, no one looked at them. Ironically, these same tapes were looked at promptly when Coryell was suspected of stealing from the store.
Failure to investigate Dupont's complaints resulted in no effective measures being taken by Speedway to stop the harassment. No disciplinary action was taken against Coryell. He was given no verbal or written reprimand that might have halted his behavior towards Dupont,[27] and in fact, he was recommended by Gelbert for a management position because he was such a "good worker."
Speedway's contention that the behavior complained about by Dupont to Ruben, Bressner and Gelbert was not sexual harassment because she did not use that term and because she did not tell the managers and supervisors enough facts, was a credibility issue resolved against Speedway by the jury. Dupont testified she told Ruben, Bressner and Gelbert, "everything." Further, the record established without conflict, that none of the three, nor Rambo, asked Dupont further questions, or for a written statement.

III. PROPRIETY OF THE $40,000.00 AWARD OF PUNITIVE DAMAGES
Speedway makes a two-fold argument to limit or strike the punitive damage award. First, it contends that Dupont should not be permitted to keep an award larger than $74,999 because she obtained a remand from the federal trial court when she contended the amount in controversy was below the federal court's jurisdictional amount; i.e., $75,000. Second, Speedway argues that its conduct was not sufficiently egregious, willful or wanton, to provide a basis for the jury's award of punitive damages.
We have been unable to find any case on point where a state law suit was filed, then removed to the federal court, and then remanded back to state court based on the plaintiff's assertion that the amount in controversy did not reach the federal court's jurisdictional amount, where the court later determined that the plaintiff could not retain the full judgment later obtained in state court, even though the amount of the award would have triggered the jurisdiction of the federal court.
The general rule followed by the federal courts is that when the propriety of removal jurisdiction is challenged, the party who obtained the removal from state court, e.g., Speedway, had the burden of proof that the amount in controversy exceeded $75,000. Any doubt about subject matter jurisdiction is resolved against the moving party.[28] To avoid remand, a defendant must establish, to a legal certainty, that plaintiff's counsel has pled in bad faith, or incompetency, and that the plaintiff's claim clearly exceeds the federal jurisdiction *89 amount. It is a very strict standard. The fact that the plaintiff may ask for, or recover, more than the federal jurisdictional amount after removal is not sufficient to support federal jurisdiction.[29]
In this case, the federal court, in granting the remand to the state court, looked at the complaint, which asserted the amount in controversy was below $50,000. It considered the fact that Dupont was seeking only $88.00 for lost back pay and an indeterminate amount for general damages (pain and suffering). It also looked at her claim for punitive damages, which requested no specific amount. It concluded that the plaintiff's attorney acted in good faith in asserting that the amount in controversy was below the federal jurisdiction amount and that to base federal jurisdiction solely on a claim for punitive damages was too speculative. Good faith pleading of the amount in controversy, not the amount actually recovered, is the rule of law for the state courts as well as where court jurisdiction is at issue. See Rappa v. Island Club West Development, Inc., 890 So.2d 477 (Fla. 5th DCA 2004).
Even though the federal court acted correctly in remanding this case back to the state court, Speedway contends Dupont should be estopped from recovering more than $74,999. It cites Roger Holler Chevrolet Co. v. Arvey, 314 So.2d 633 (Fla. 4th DCA 1975). However, that case turned on a pleading by the plaintiffs in which they specifically asked for $2,000 in punitive damages and were awarded $5,000. The appellate court said that was an unfair "surprise" at trial and directed reduction of the award to $2,000. In this case, Dupont specified no sum for punitive damages.
Speedway also cites Schilling v. Chrysler Finance Co., L.L.C., 2000 WL 549730 (S.D.Ala.2000), in which the court adopted a magistrate's order that approved remand of a case to the state court where the defendant consented to the removal. In Schilling, the plaintiff stipulated as to damages below the $75,000 jurisdictional amount. The order contained a warning that if the plaintiff attempted to recover more than $74,999 the defendant should bring it to the attention of the court and the court would conduct a Rule 11 hearing as to why plaintiff's counsel should not be sanctioned. No such events took place in this case.
Similarly, in Watson v. ITT Sheraton Corp., 61 F.Supp.2d 529 (N.D.Miss.1997), the court treated the motion to remand as a stipulation, which would preclude the plaintiff from increasing the amount requested in the ad damnum clause in the state court. This ruling was based on Mississippi law that limits a plaintiff's recovery to the amount pled. As noted in this case, no specific amount was pled.
The more difficult issue is whether, based on the most favorable, reasonable inferences, in this record in Dupont's favor, there was a basis for the punitive damage award. The trial court directed the jury that in order to award punitive damages it had to determine Speedway acted willfully, intentionally, or with callous and reckless indifference to Dupont's rights. It made that determination in Dupont's favor.
However, it is not clear what the standard is for punitive damages awarded under section 760.10. The Florida statute contains no express requirement that actions appropriate for punitive damage *90 awards must be willful, malicious or constitute wanton conduct by the employer, as opposed to Title VII of the federal statute, which does contain such a provision.
A complaining party may recover punitive damages under this section against a respondent (other than a government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.
In contrast, the Florida statute simply provides that punitive damages may be awarded.
The court may also award compensatory damages including, but not limited to, damages for mental anguish, loss of dignity, and any other intangible injuries, and punitive damages.
Section 760.11 further limits punitive awards to $100,000 and exempts recoveries of punitive damages under this chapter from the limitations and restrictions imposed on other civil awards pursuant to sections 768.72 and 768.73.
Because state law governs state statutes,[30] it may well be that Mercury Motors Express, Inc. v. Smith, 393 So.2d 545 (Fla. 1981) is controlling. That case held that an employer may be held vicariously liable for acts of its employees for punitive damages if the acts of the employee are willful and wanton, and there is some basis to find fault on the part of the employer itself, independent of the employee's action. However, the action or non-action of the employer need not be willful or wanton. Ordinary negligence is sufficient. Mercury Motors. These views were recently affirmed in a more recent opinion. See Schropp v. Crown Eurocars, Inc., 654 So.2d 1158 (Fla.1995).
Applying that ruling to the present case, Coryell's harassment of Dupont was clearly willful and wanton and based on the jury's verdict, and Speedway was at fault, or at least negligent, for not taking prompt, remedial action after having notice of Coryell's conduct. Thus, punitive damages would have been sustainable without a finding by the jury that Speedway itself acted in a willful, wanton manner. However, the effect of applying this rule to section 760.10 cases would result in allowing punitive damages in almost every case.
On the other hand, if willful and wanton behavior on the part of an employer in a sexual harassment case by a co-worker must be established, this is a close case. In Harris v. L & L Wings, Inc., 132 F.3d 978 (4th Cir.1997), the court sustained a jury's award of punitive damages in a sexual harassment case brought under Title VII. The harassment facts in that case were more egregious than those in this case. However, in sustaining the punitive damage award, the court made note of the large number of complaints made by the victims to their managers over a two-month period. It also noted there was no written sexual harassment policy so the victims did not have a contact in the event of a problem. It concluded that to sustain punitive damages in such cases, more than mere notice of the harassment must be established. Whether an employer responded adequately to harassment complaints, whether it ignored its own harassment policy, and whether it moved the complaining employee to a less attractive job to avoid the harasser were key considerations. Harris. The court also concluded that the employer's "utter failure to respond to repeated complaints of pervasive *91 sexual harassment" was sufficient to sustain the punitive damage award.
In the case sub judice, the jury could have found, based on this record, that Speedway had notice of Dupont's sexual harassment complaints in March and took no action until May. Dupont complained to three supervisors or managers and they reported to the District Manager, yet nothing was initially done about these complaints. The later remedy was quickly dissolved under scheduling difficulties and Dupont was left, in the end, with no remedy.
Further, the employer, in contravention of its sexual harassment policy, undertook no investigation to ascertain the veracity of Dupont's complaints. It also did not counsel Coryell or discipline him in any way. At trial, the testimony of the management level employees to whom Dupont complained, contradicted one another as to when and what they reported to Rambo and Gelbert. Gelbert denied knowing about Dupont's complaints, despite earlier testimony which established he was told by Ruben. He also denied knowing about Ford's similar complaints about Coryell, even though Ford testified she told him and obtained a shift change to get away from Coryell.
Thus, the jury could have concluded Speedway's management-level employees were not truthful, and that Speedway's reckless indifference to Dupont's complaints about sexual harassment allowed the harassment to continue for weeks and eventually forced her to leave her job. The jury also could have concluded that the belated and inconsistent shift change remedy was both not prompt and/or inadequate and allowed the harassment to continue unabated. This demonstrated callous indifference to the discrimination Dupont suffered as Speedway's employee.
Lastly, we note that the amount of punitive damages awarded in this case does not appear excessive. The punitive damage award is almost the same as the compensatory award. See Worth v. Tyer, 276 F.3d 249 (7th Cir.2001).
Accordingly, we affirm the decision below, but because the issue is one of great public importance in future like cases, we certify the following question to the Florida Supreme Court:
DOES THE RULE ANNOUNCED IN MERCURY MOTORS EXPRESS, INC. v. SMITH, 393 So.2d 545 (Fla.1981), UNDER WHICH AN EMPLOYER CAN BE HELD VICARIOUSLY LIABLE FOR PUNITIVE DAMAGES BASED UPON THE WILLFUL AND WANTON CONDUCT OF ITS EMPLOYEE, APPLY TO PUNITIVE DAMAGE AWARDS UNDER SECTION 760.11(5), FLORIDA STATUTES?
AFFIRMED.
PLEUS, C.J., GRIFFIN, SAWAYA, PALMER, MONACO, TORPY and LAWSON, JJ., concur.
ORFINGER, J., concurs and concurs specially with opinion.
THOMPSON, J., dissents with opinion.
ORFINGER, J., concurring and concurring specially.
As a member of the panel that originally reversed the judgment in Dupont's favor, I write to explain why I now join the majority in upholding the jury verdict.
Looked at as discrete incidents, none of Coryell's conduct is enough to give rise to employer liability. But taken as a whole, I agree with the majority that Dupont brought forth sufficient evidence to sustain the jury's sexual harassment, hostile work environment claims. In the original opinion, *92 I focused on the trees and lost the forest. On reflection and looking at the record as a whole, I am compelled to acknowledge the error of the original decision and join today's majority.
THOMPSON, J., dissenting.
I respectfully dissent. I would reverse the trial court's denial of Speedway's motion for judgment notwithstanding the verdict because Dupont's evidence was insufficient to demonstrate that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a hostile work environment. See Gupta v. Fla. Bd. of Regents, 212 F.3d 571 (11th Cir.2000); Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir.1999). More important, after review of the Florida and federal law on the topic of punitive damages in Title VII cases, I disagree with the majority's discussion and conclusion on punitive damages.
Speedway argues that Dupont's allegations did not demonstrate sexual harassment sufficient to create a hostile work environment. See Burlington Indus. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). To establish a hostile work environment in a sexual harassment case, Dupont must prove that: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms of employment and create a discriminatorily abusive working environment; and (5) there exists a basis for holding the employer liable. Mendoza, 195 F.3d at 1245; Henson v. City of Dundee, 682 F.2d 897 (11th Cir.1982).

Severe and Pervasive Harassment
Dupont did not demonstrate that the alleged harassment was sufficiently severe or pervasive to alter the terms of employment or create a hostile working environment. She needed to show "that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). Coryell's comments that she looked "hot" and that she would look good as a biker chick do not rise to the level of discriminatory conditions of employment. They do not become discriminatory if Dupont thought Coryell did not really mean them. See Gupta, 212 F.3d at 584 (noting that individuals may compliment other's looks without fear of being found guilty of sexual harassment).
Aside from commenting on Dupont's looks, Coryell did not make any other arguably sexual comments about her. Repeated comments with sexual overtones and vulgar comments about female customers that indicate sexual desire do not, by themselves, establish a hostile work environment. See Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 258 (4th Cir. 2001) (describing supervisor's frequent jokes with sexual overtones, frequent use of the words "coming" and "f* * *ing," and habit of saying "oh my rod" when seeing attractive women); see also Pryor v. Seyfarth, Shaw, Fairweather & Geraldson, 212 F.3d 976, 977-78 (7th Cir.2000) (holding there was no actionable claim for sexual harassment, though individual asked plaintiff for pictures of her in lingerie, asked if clothes in her shopping bag were from Frederick's of Hollywood, and showed her pictures of women in bondage).
Dupont also complained that Coryell touched her buttocks and rubbed her shoulders in a sexual manner. This type of physical conduct generally should be extensive, longlasting, unredressed, uninhibited, and must permeate the plaintiff's work environment to be actionable. See *93 Indest v. Freeman Decorating, Inc., 164 F.3d 258, 263 (5th Cir.1999); see also Alfano, 294 F.3d at 374 (stating that "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"). For example, in Mendoza, 195 F.3d at 1247-48, the court concluded that the alleged conduct fell well short of the severity or pervasiveness sufficient to alter the plaintiff's conditions of employment when the offending employee rubbed his hip against her hip while rubbing her shoulders, smiled, told her he was getting "fired up," made sniffing sounds while looking at her groin, followed her constantly, and stared in a "very obvious fashion."
The offending conduct must be extreme. Faragher v. City of Boca Raton, 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The conduct must be hostile enough to create an objectively hostile or abusive environment that a reasonable person would find hostile or abusive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Mendoza is instructive:
Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms ... of employment includes a subjective and an objective component. The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms ... of employment, and this subjective perception must be objectively reasonable. The environment must be one that a reasonable person would find hostile or abusive and that the victim... subjectively perceive[s] ... to be abusive. Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.
Mendoza, 195 F.3d at 1246 (emphasis added, and citations and internal quotation marks omitted).
The objective component of this analysis is fact intensive. The court must consider four factors in determining whether the harassment objectively altered an employee's terms or conditions of employment: (1) frequency of conduct; (2) severity of conduct; (3) whether the conduct is physically threatening or humiliating or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Id.; see also McCaw Cellular Comms., Inc. v. Kwiatek, 763 So.2d 1063, 1066 (Fla. 4th DCA 1999). Appellate courts reviewing the objective severity of harassment may not rely upon the jury's findings of wrongdoing. Cf. McCaw Cellular, 763 So.2d at 1065 (reversing jury's award of $1,305,000, including punitive damages, where the conduct was not objectively hostile enough to constitute a material change in employment conditions).
The appellate court must conduct this critical analysis. Here, the majority notes Dupont claimed subjective harm, then concludes that "[w]hether a reasonable person would have been so affected by Coryell's behavior was a jury issue that was resolved against Speedway." Op. at ___. This conclusion does not implement the analysis to determine objective severity because, by this reasoning, a jury verdict always precludes appellate review of objective reasonability. The court must measure the objective reasonableness of the employee's belief against existing substantive law and consider the effect of the conduct on the reasonable person. Alfano, 294 F.3d at 372; cf. Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999) (reversing $185,000 award in a retaliatory discharge case where, despite jury's agreement with plaintiff's subjective belief *94 that employer engaged in an unlawful employment practice, her belief was not objectively reasonable).
There is no minimum number of incidents to establish a hostile work environment. Worth v. Tyer, 276 F.3d 249, 268 (7th Cir.2001). Thus, I agree that "only one instance of physically harassing conduct, if extreme, can constitute a hostile work environment." Op. at 84. However, this case is easily distinguished from that in which an employee was drugged and raped by a coworker who had continued to work, despite the employer's knowledge of previous drug-induced sexual assaults. Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir.2001). That case stands for the proposition, unobjectionable but not relevant here, that a single incident of sexual assault may create an abusive work environment under Title VII. Id.; Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir.1995).[31]
Likewise, though sexual battery and threats of physical violence may constitute sexual harassment, op. at 84, neither occurred here. I agree that courts reviewing harassing conduct should not look at "micro-bites of behavior in isolation," op. at 84, but note that courts considering the totality of the circumstances must consider those actually alleged or reasonably inferred from the record. Review of the majority's cases on the issue of "a few physical and intimate touching[s]" shows all involve unwanted sexual advances by supervisors and are distinguishable.[32]
Dupont testified that the incidents occurred over eight or nine weeks. She alleged that Coryell smacked her buttocks once, rubbed against her a few times, grabbed her once as she stepped around a corner, and made numerous inappropriate comments. Comparing these allegations to conduct deemed nondiscriminatory by other courts indicates that the conduct is not sufficiently severe. See, e.g., Gupta, 212 F.3d at 584-85 (supervisor touched employee's jewelry and often asked her to lunch; touched her knee and raised her dress hem while asking about the material; said she looked beautiful while staring at her; called her home two or three nights per week and asked about her boyfriend; and suggested he wanted to spend the night); Minor v. Ivy Tech State College, 174 F.3d 855, 857 (7th Cir.1999) (supervisor once put his arms around plaintiff, kissed and squeezed her, and asked: "Now, is this sexual harassment?"); Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 874 (5th Cir.1999) (affirming summary judgment for employer where *95 harassing conduct occurred for approximately two years and included instances in which harasser rubbed plaintiff's arm, asked her to sit on his lap, and tried to stare down her blouse); Weiss v. Coca-Cola Bottling Co., 990 F.2d 333, 334-35 (7th Cir.1993) (supervisor asked about plaintiff's personal life, complimented her looks, asked for dates, called her a dumb blonde, repeatedly put his hands on her shoulders, placed "I love you" signs in her work area, and attempted to kiss her on three occasions); Willets v. Interstate Hotels, LLC, 204 F.Supp.2d 1334, 1337 (M.D.Fla.2002) (supervisor tried to hug plaintiff 20 times, rubbed her head and shoulders, frequently indicated love for her, and once grabbed her buttocks, kissed her neck, and placed a hand on her inner thigh); Fromm-Vane v. Lawnwood Med. Ctr., Inc., 995 F.Supp. 1471, 1474 (S.D.Fla. 1997) (supervisor's reference to size of employee's husband's penis, women's breasts, and sexual exploits with his girlfriend and discussions regarding his visits to "whorehouses").
The majority concedes that relevant caselaw holds that, in "similar" or "worse" cases, courts have found that sexual harassment was not sufficiently severe. Op. at 85. The majority does not distinguish these cases, but asserts that there is liability under other cases with "similar" or "lesser" facts. Op. at 85. A close reading of the cases cited by the majority shows they involve harassment that is neither "similar" nor "lesser" in egregiousness.[33]

Sex-Based Discrimination
Dupont must demonstrate that the conduct occurred because of her sex. See *96 Alfano, 294 F.3d at 374. Harassment arising from personal animosity directed at one person alone may form the basis for a hostile work environment claim, but only if there is evidence to support the finding that the harassment was causally related to the employee's sex. See Green v. Administrators of the Tulane Educ. Fund, 284 F.3d 642, 656-57 (5th Cir.2002) (finding sufficient evidence where the jury could have inferred that the employee harassed the plaintiff because she refused to continue their casual sexual relationship); see also Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772 (4th Cir.1997) (holding that only harassment based on plaintiff's sex is actionable).
It is not enough to allege the challenged conduct was sex-specific; Dupont must show that Coryell treated her differently or with greater hostility because she was a woman. Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 261-62 (4th Cir.2001) (holding that the evidence compelled the conclusion that the harasser was an indiscriminately vulgar and offensive coworker, obnoxious to men and women alike); see also Alfano, 294 F.3d at 369-72 (holding that, despite periodic hostility over four years and four incidents with overtly sexual overtones, the plaintiff did not establish a hostile work environment as a matter of law). The key issue is whether women were exposed to disadvantageous terms or conditions of employment to which men were not exposed. Lack, 240 F.3d at 261; see also Knox v. Neaton Auto Prods. Mfg., Inc., 375 F.3d 451, 457-58 (6th Cir.2004) (holding that alleged harasser's comments and hostile behavior toward plaintiff did "not constitute circumstantial evidence of sex-based discrimination, as opposed to sex-neutral animosity between [them]").
Notably, many of the alleged incidents of harassment cited by Dupont did not involve her, but other female customers. Gleason v. Mesirow Fin., 118 F.3d 1134, 1144 (7th Cir.1997). Such incidents may be relevant to showing a hostile work environment, but the impact of this "second-hand harassment" is not as great as harassment directed at Dupont. Id. Dupont alleged that Coryell "referred to female customers as `bitchy' or `dumb,' on occasion appeared to be ogling other female [customers], ... [and] commented on [their] anatomy." Id. at 1144-45. This off-color, juvenile, and inappropriate behavior no doubt contributed to Dupont's perception of Coryell as a jerk. See id. at 1145. But the question is whether Dupont, "particularly when this alleged behavior was directed at others and not herself, could `rationally consider herself at a disadvantage in relation to her male co-workers by virtue of being a woman.'" Id. (citation omitted). Given Coryell's apparent habit of swearing at male and female customers after they left the store, Coryell's vulgar expressions of desire for members of the opposite sex does not constitute evidence that he was any less overbearing and contemptuous toward men as well as women. See id.; Op. at 85.
The majority's language focuses on two issues to determine whether Coryell's conduct was sex-based: (1) the jury could conclude that Dupont "perceived" Coryell's actions "were directed at her because she was female"; and (2) Coryell "lusted after females[,] ... enjoyed demeaning them," "craved their body parts [and] wanted sex with them." Op. at 85.
The first point is not material; the plaintiff must show that the discrimination actually was motivated by sex, not merely that she believed it was. The objective reasonableness of her belief may be measured against existing substantive law. Cf. Clover, 176 F.3d at 1351. The second point is possibly true, but not relevant. The evidence, *97 in the light most favorable to Dupont, establishes that Coryell was coarse, vulgar, and unprofessional. He insulted the intelligence of male and female customers, made blonde jokes, desired sex with women generally, and commented crassly about some female customers' bodies. However, Coryell's lust was not realized by any sexual assault or proposition aimed at anyone, not even Dupont. There is no basis for imposing liability for the harasser's vulgar, lustful comments that are unaccompanied by severe or pervasive harassment or sexual advances. Coryell's failure to "crave" male customers is irrelevant to determining whether his conduct was motivated by Dupont's sex. Moreover, the majority's language, which justifies finding sex-based harassment based primarily on a boorish employee's vulgar expression of "lust" for individuals other than the plaintiff, is difficult to square with the well-settled rule that sexual harassment statutes are not intended to be "general civility codes." See Faragher, 524 U.S. at 788, 118 S.Ct. 2275.
The majority also addresses the question of sex-based discrimination by stating that "[not] all offensive conduct is . . . required to include sexual overtures, if the behavior is motivated by hostility towards women because of their gender." The case cited to support this premise is inapposite. In fact, the behavior there was much more egregious than that here. In Hall v. Gus Construction Co., Inc., 842 F.2d 1010 (8th Cir.1988), the following facts were found:
[M]ale members of the construction crew ... incessantly referred to the women as "f[*****]g flag girls." [They] nicknamed Ms. Ticknor "Herpes". . . . "Cavern C[**]t" written in the dust on the driver's side [of one woman's car], and "Blond Bitch" written on the passenger side.... Male crew members repeatedly asked Ms. Hall if she "wanted to f[**]k" and requested that Ms. Hall and Ms. Baxter engage in oral sex with them. [The foreman,] Mundorf[,] was present during some of these incidents, and on one occasion used the term "f[*****]g flag girls." . . .
In addition . . ., male coworkers subjected Ms. Hall and Ms. Baxter to offensive and unwelcomed physical touching. Male crew members would corner the women . . . and rub their hands down the women's thighs. They grabbed Ms. Hall's breasts. One crew member picked up Ms. Hall and held her up to the cab window so other men could touch her. Mundorf observed this incident but did nothing.
All three women also experienced other types of abuse at work. Male crew members frequently pulled down their pants and "mooned" the women while they were working. One crew member exposed himself.... Male crew members flashed obscene pictures . . . at the women. A male crew member urinated in Ms. Hall's water bottle. Several men urinated in the gas tank of Ms. Ticknor's car, causing it to malfunction. . . . Male crew members would refuse to give the women a truck to take to town for bathroom breaks. When the women would relieve themselves in the ditch, male crew members observed them through surveying equipment. Mundorf knew about this practice, but he disciplined no one.
Hall, 842 F.2d at 1012.
Finally, citing the need to liberally construe the Act, the majority writes:
Almost every state agency and governmental entity is covered by rules and policies which make the type of conduct engaged in by Coryell illegal and unacceptable in the workplace. For us to hold that Coryell's conduct . . . is so *98 minimal that it does not constitute a prima facie case of sexual harassment under section 760.10, would weaken and demean the statute's purpose.
Op. at 86.
Coryell's conduct was deplorable; nevertheless, a guide on appropriate workplace conduct from, say, the Department of Children and Families bears little on whether Coryell's conduct was so severe or pervasive that it objectively and subjectively altered the terms of Dupont's employment. Nor does any governmental entity's rules and policies relate to the issue of whether Coryell's conduct was motivated by sex-based discrimination.
The majority's second point is not supported by caselaw. Sexual harassment claims under Title VII and section 760.10 are not actionable unless specific elements are met. Analyzing reprehensible conduct and determining that a plaintiff's claim falls short does not "weaken and demean" the statute; it is consistent with the fact that the statutes do not target all boorishness, or even, necessarily, all harassing conduct. Finally, it acknowledges the well-settled principle that, in sexual harassment claims, jurors and judges may not ignore the statutory requirements for liability and excuse a plaintiff from her burden merely because they are offended by the employee's conduct and incivility. The purpose of Title VII, and acts styled after it, is primarily remedial, aimed at avoiding and preventing discrimination, rather than imposition of punitive damages. Swenson, 271 F.3d at 1197.
Coryell's conduct was reprehensible, and Dupont's trial testimony  as opposed to her deposition testimony  arguably presented a close question as to whether she alleges conduct severe and pervasive enough to preclude summary judgment. However, in light of caselaw, I cannot conclude Dupont alleged discriminatory conduct sufficiently severe or pervasive enough to alter the terms of employment when viewed in light of the conduct's effect on a reasonable person.

Employer Liability
If Coryell's behavior constituted actionable sexual harassment, Speedway may be liable for inadequate remedial action. Nevertheless, I clarify some concerns raised by language in the majority opinion.
The plaintiff must show "a specific basis exists for imputing the objectionable conduct to the employee." Alfano, 294 F.3d at 373. To establish employer liability for a coworker, the plaintiff must demonstrate that the employer knew or should have known of the sexual harassment, but failed to implement prompt and appropriate action. Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir.2002) (holding employer liable where it scheduled the harasser and plaintiff to work in different buildings or on different shifts for a second time, when that measure had proven unsuccessful). Notwithstanding the existence of sexual harassment, an employer may avoid Title VII liability by taking prompt, remedial action reasonably calculated to end sexual harassment. Harvill v. Westward Comms., L.L.C., 433 F.3d 428, 437 (5th Cir.2005) (quoting Nash v. Electrospace Sys., Inc., 9 F.3d 401, 402 (5th Cir.1993)); Knabe v. Boury Corp., 114 F.3d 407, 412-13 (3d Cir.1997). Depending on the alleged conduct, confrontations, interviews, and termination may not be required. Harvill, 433 F.3d at 437. If an investigation occurs, a warning issues, and harassment stops, the employer would be entitled to summary judgment in its favor. Woods v. Delta Beverage Group., Inc., 274 F.3d 295, 300-01 (5th Cir.2001).[34]
*99 Of course, employers should investigate when employees allege they have been sexually harassed. Nevertheless, it is important to note that there is no per se rule providing that the employer is strictly liable for any further harassment, and there is no rule requiring the employer to terminate accused employees. Id. (citing Mota v. Univ. of Texas Houston Health Sci. Center, 261 F.3d 512, 525 (5th Cir.2001)). As Swenson stated:
As a matter of policy, it makes no sense to tell employers that they act at their legal peril if they fail to impose discipline even if they do not find what they consider to be sufficient evidence of harassment.... Employees are no better served by a wrongful determination that harassment occurred than by a wrongful determination that no harassment occurred. We should be wary of tempting employers to conduct investigations that are less than fully objective and fair. Title VII in no way requires an employer to dispense with fair procedures for those accused or to discharge every alleged harasser.
Swenson, 271 F.3d at 1196-97 (citations and internal quotation marks omitted).
The majority's assertion that moving Dupont back to her original shift "was improper, in itself" could be misconstrued. Op. at 87. While an employer generally does not satisfy its remedial obligation by transferring the victim to a position involving a less desirable location, working hours, or commuting time, "not every transfer adversely affects the victim's employment." Swenson, 271 F.3d at 1194. When deciding to separate two employees, the employer enjoys wide discretion to consider the ease of moving them and their importance to its business operations, so long as the accuser is not simply moved to an objectively less desirable position. Id. Courts must remain
mindful of the difficulty employers face when dealing with claims of harassment, finding themselves between the rock of an inadequate response under Title VII and the hard place of potential tort liability for wrongful discharge of the alleged harasser. The legal standard of "prompt and adequate remedial action" in no way requires an employer to dispense with fair procedures for those accused or to discharge every alleged harasser.
Harris v. L & L Wings, 132 F.3d 978, 984 (4th Cir.1997); see also Swenson, 271 F.3d at 1196.
That said, the majority correctly states that the issue of notice is usually a jury question if notice is disputed. See, e.g., Breda v. Wolf Camera & Video, 222 F.3d 886, 890 (11th Cir.2000) (reversing summary judgment where supervisor who heard the complaints disputed whether plaintiff's complaints indicated sexual harassment rather than general workplace animosity, and where it was undisputed that plaintiff complained to manager several times).

Punitive Damages

Mercury Motors
Even if Dupont demonstrated actionable harassment, and assuming further that Speedway is liable for Coryell's "actionable sexual battery," there is no basis for punitive damages. The majority's conclusion regarding punitive damages is contrary to well-settled state and federal law. The opinion addresses the employer's liability *100 for punitive damages by citing a single state case and a single federal case, and its application appears inconsistent with a legion of state and federal cases. The opinion's suggestion is that "it may well be that Mercury Motors Express, Inc. v. Smith, 393 So.2d 545 (Fla.1981) is controlling." Op. at 90. Let's examine this state case.
Mercury Motors involved an employer's vicarious liability for its employee's reckless operation of a tractor-trailer committed within the scope of his employment. I find no Florida case that applied Mercury Motors to discrimination claims arising under the Florida Civil Rights Act ("Act")[35] in the 25 years since Mercury Motors was decided. Mercury Motors explicitly addressed the standard for an employer's vicarious liability for punitive damages under the doctrine of respondeat superior. Mercury Motors, 393 So.2d at 549. However, Florida's common law doctrine of respondeat superior is different from the legal standard for liability under the Act. Castleberry v. Edward M. Chadbourne, Inc., 810 So.2d 1028, 1029 (Fla. 1st DCA 2002) (holding trial court improperly applied respondeat superior); see also Sussman v. Fla. E. Coast Properties, Inc., 557 So.2d 74, 75 (Fla. 3d DCA 1990) (noting in a workers' compensation case the different policy concerns implicated by imposing employer liability for an employee's conduct that harms himself or a fellow employee, and conduct that harms third persons).
The majority recognizes that the Act is derived from Title VII, but does not apply the well-settled rule that, "when Florida statutes are adopted from an act of Congress, the Florida Legislature also adopts the construction placed on that statute by the federal courts insofar as that construction is not inharmonious with the spirit and policy of Florida's general legislation on the subject." Russell, 887 So.2d at 377 (quoting Green v. Burger King Corp., 728 So.2d 369, 370-71 (Fla. 3d DCA 1999)); see also Orlando v. Fla. Pub. Employees Relations Com., 435 So.2d 275, 279 (Fla. 5th DCA 1983). Applying this construction, there is a panoply of state and federal cases explicitly holding that Title VII caselaw applies to claims under the Act, which was modeled after Title VII.[36] No other court has applied Mercury Motors in this context or held that an employer's mere negligence justifies punitive damages in a coworker harassment claim.
The majority's approach is contradicted by a federal case interpreting Florida law, which addressed punitive damages under section 760.11(5) and expressly applied federal law to conclude that, under Kolstad v. American Dental Association, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable *101 in punitive damages." Hipp v. Liberty Nat'l Life Ins. Co., 65 F.Supp.2d 1314, 1343 (M.D.Fla.1999), rev'd on other grounds, 252 F.3d 1208 (11th Cir.2001).
The majority's comparison of Title VII and the Act does not support its holding. As the Florida Supreme Court noted in 1989, punitive damages had not been mentioned under the Act and were infrequently awarded. Ranger Ins. Co. v. Bal Harbour Club, Inc., 549 So.2d 1005, 1009 (Fla. 1989). The Act's failure to mention punitive damages was not surprising in light of the similar gap in Title VII:
Prior to 1991, only equitable relief ... was available to prevailing Title VII plaintiffs; the statute provided no authority for an award of punitive or compensatory damages. With the passage of the 1991 Act, Congress provided for additional remedies, including punitive damages, for certain classes of Title VII. . . violations.
Kolstad, 527 U.S. at 533-34, 119 S.Ct. 2118 (citations omitted).
Shortly after Title VII was revised to allow punitive damages, the Florida Legislature passed chapter 92-177, Laws of Florida, which revised the Act. The legislature created section 760.11(5), which provided:
In any civil action brought under this section, the court may . . . award compensatory damages, including, but not limited to, damages for mental anguish, loss of dignity, and any other intangible injuries, and punitive damages. The provisions of ss. 768.72 and 768.73 do not apply to this section. The judgment for the total amount of punitive damages awarded under this section to an aggrieved person shall not exceed $100,000. In any action or proceeding under this subsection, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs. It is the intent of the Legislature that this provision for attorney's fees be interpreted in a manner consistent with federal case law involving a Title VII action. . . . Notwithstanding the above, the state and its agencies and subdivisions shall not be liable for punitive damages.
§ 760.11(5), Fla. Stat. (1992).[37]
The majority correctly notes that this subsection does not contain the precise language concerning punitive damages under Title VII:
A complaining party may recover punitive damages under this section against a respondent . . . if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.
42 U.S.C. § 1981a(b)(1).
Thus, it concludes that "it is not clear what the standard is for punitive damages awarded under section 760.10." Op. at 89.
In analyzing the Act's language, the court must presume that the legislature stated in chapter 760 what it meant, and meant what it said. Klonis v. Dep't of Revenue, 766 So.2d 1186, 1189 (Fla. 1st DCA 2000). "If the statutory wording is unambiguous, then judicial inquiry is complete." Id. Arguably, there is ambiguity here; section 760.11(5) does not explicitly provide that the award of punitive damages must be construed in accordance with caselaw discussing Title VII.
However, the majority's conclusion overlooks two principles of statutory construction. *102 The first rule, previously mentioned, is that, "when Florida statutes are adopted from an act of Congress, the Florida Legislature also adopts the construction placed on that statute by the federal courts insofar as that construction is not inharmonious with the spirit and policy of Florida's general legislation on the subject." Russell, 887 So.2d at 377; see also Kidd v. Jacksonville, 97 Fla. 297, 304-05, 120 So. 556 (Fla.1929). Notwithstanding its reliance on "liberal construction," the majority cannot claim that applying Title VII caselaw on punitive damages is inharmonious with the spirit and policy of the Act, which is modeled after Title VII. More important, a second crucial rule of statutory construction states:
Florida's well-settled rule of statutory construction is that the legislature is presumed to know the existing law when a statute is enacted, including judicial decisions on the subject concerning which it subsequently enacts a statute. Without any clear express changes on the statute's face, the amendment did not recede from our decisions rendered prior to the amendment's enactment.
Crescent Miami Ctr., LLC v. Fla. Dep't of Revenue, 903 So.2d 913, 918 (Fla.2005); see also Jones v. ETS of New Orleans, Inc., 793 So.2d 912, 917 (Fla.2001) (noting "the `legislature is presumed to know the judicial constructions of a law when enacting a new version of that law' and `the legislature is presumed to have adopted prior judicial constructions of a law unless a contrary intention is expressed in the new version'").
The Florida Supreme Court has long recognized that Title VII was the model for the Act. See Byrd v. Richardson-Greenshields Secur., Inc., 552 So.2d 1099, 1102 (Fla.1989) (holding that the interpretation accorded Title VII is persuasive in interpreting analogous language of the Act). The legislature revised the Act and provided for punitive damages shortly after Title VII did the same. In revisions since 1992, the legislature has never revisited the punitive damages portion of section 760.11(5) to countermand the rule that Title VII caselaw applies to interpretation of the Act. The statute does not incorporate mere negligence for punitive damages anywhere in section 760.11(5), nor has it ever done so. Thus, Mercury Motors would not apply.
An examination of Mercury Motors illustrates why the legislature and Florida courts have not applied its reasoning to coworker harassment claims. The majority states that Coryell's conduct was willful and wanton, and Speedway was liable for not taking prompt, remedial action. Op. at 90. This assertion merely restates the requirement for employer liability for straightforward compensatory damages. Castleberry, 810 So.2d at 1029-30. The majority notes that applying this rule "would result in allowing punitive damages in almost every case." Op. at 90. The effect of this rule would allow the jury to consider punitive damages in every coworker harassment case because a finding of employer liability would automatically mandate allowance of punitive damages.
This interpretation would require one to accept that: (1) the legislature, by creating section 760.11, adopted a standard opposed to the Title VII standard; (2) the legislature, rather than restricting punitive damages to a "narrow class of cases," provided for punitive damages in virtually all cases arising under the section; and (3) the legislature did so by silently adopting a negligence standard that has never applied to coworker harassment claims under the Act.
Section 760.01(3) provides that the Act "shall be construed according to the fair import of its terms and shall be liberally *103 construed to further the general purposes stated in this section and the special purposes of the particular provision involved" (emphasis added). But the rule of liberal statutory construction in section 760.01(3) "guides the interpreter in making an interpretative choice when the text may reasonably be understood in more than one way. That circumstance does not present itself here." Gallagher v. Manatee County, 927 So.2d 914 (Fla. 2d DCA 2006) (emphasis in original). Liberal construction is not need on this issue.

Harris and Kolstad
Viewed in the light most favorable to Dupont, even if we use the case cited by the majority, the evidence does not support the award of punitive damages under federal law. The majority cites Harris v. L & L Wings, Inc., 132 F.3d 978 (4th Cir.1997) to support the imposition of punitive damages on Speedway. The majority concedes that the conduct in that case "was more egregious." Op. at 90. There, the employer knew of daily gropings and sexual advances by the floor manager, offers of promotions or money in exchange for sex, and virtually unceasing physical and verbal harassment lasting more than two years. 132 F.3d at 980-84. Several employees complained repeatedly of sexual harassment, but their complaints were ignored; moreover, at trial, the company president expressly disavowed any responsibility to rid his workplace of sexual harassment, considering a written policy against sexual harassment "a ridiculous thing." Id. at 983-84. If Harris establishes the criteria for punitive damages, Speedway should not be held liable. Speedway had a written policy against sexual harassment. When complaints were presented to Speedway, it took remedial action, even if belated. Further, management never disavowed any responsibility to stop harassment in the workplace. As stated by the majority, the management in Harris ignored allegations, was complicit in the harassment, and expressly abdicated any responsibility for the problem. There was no such basis for culpability here.
Punitive damages are an "extraordinary remedy" appropriate only in a narrow class of cases in which the employer engaged in discriminatory practices with malice or reckless indifference to the plaintiffs' federally protected rights. Harris, 132 F.3d at 982; see also Wilbur v. Corr. Servs. Corp., 393 F.3d 1192, 1205 (11th Cir.2004) (noting plaintiff did not show that higher management countenanced or approved the offending behavior of Wilbur's supervisors); DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir.1995); cf. Chavez v. Thomas & Betts Corp., 396 F.3d 1088, 1097-98 (10th Cir.2005) (justifying punitive damages where employer was recklessly indifferent; supervisors ignored plaintiff's complaints and did not act on or report harassment, despite witnessing harasser pull open plaintiff's clothes to expose her underwear to coworkers and hearing harasser frequently encourage coworkers to speculate about plaintiff's underwear and the color of her pubic hair). The issue of punitive damages may not reach the jury unless the plaintiff shows the employer's culpable state of mind, not merely that of the harasser. See Anderson v. G.D.C., Inc., 281 F.3d 452, 460-61 (4th Cir.2002) (concluding punitive damages could be imposed where the managerial employee unquestionably knew of daily, pervasive harassment, knew that the harassment was prohibited by federal law, and intentionally discriminated while acting in the scope of employment); see also Green, 284 F.3d at 654 (holding employer did not adequately reprimand offender and resolve problem, but there was no evidence employer did not act in good faith to stop harassment); cf. Harris, 132 F.3d at 983.
*104 Even after showing the required malice or reckless indifference on the part of some individuals, the plaintiff must still establish that the employer should be held liable for punitive damages. Kolstad, 527 U.S. at 539, 119 S.Ct. 2118. "In a sexual harassment case, clearing this `higher hurdle' demands more than mere proof of the notice required for compensatory damages." Harris, 132 F.3d at 983 (emphasis added). Malice or reckless indifference is not shown by the employer's negligence, ineptitude, or poor judgment; rather, the plaintiff must establish that the employer discriminated "in the face of a perceived risk that its action will violate federal law." Kolstad, 527 U.S. at 536, 119 S.Ct. 2118. Dupont could not establish that Speedway was aware of the law and willfully chose to discriminate anyway, or that its principals authorized the action. See Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 335-36 (4th Cir.2003) (holding punitive damages should not have gone to the jury, despite evidence supporting employer liability for a hostile work environment and where plaintiff repeatedly tried to talk to managers about harassment, but supervisor actively tried to prevent plaintiff from talking to the managers); cf. Farfaras v. Citizens Bank & Trust of Chi., 433 F.3d 558, 567 (7th Cir.2006) (upholding punitive damages where employers boasted that their wealth allowed them to flout the law and harass the victim with impunity); Fine v. Ryan Int'l Airlines, 305 F.3d 746, 754-55 (7th Cir.2002) (ruling damages were appropriate where plaintiff, after complying with employer's requirement that she submit in writing her sexual harassment claims, was fired with the consent of company's president and general counsel).
The facts, viewed in the light most favorable to Dupont, indicate she spoke to managers about the conduct, Speedway attempted belatedly and unsuccessfully to remedy the harassment, and Dupont was displeased with the remedy. Such a failure, even if Speedway was liable for severe or pervasive harassment, does not place this case within the "narrow class of cases" where the employer acts "with malice or reckless indifference" to its employees' federally protected rights. Pedroza v. Cintas Corp. No. 2, 397 F.3d 1063, 1071 (8th Cir.2005). An employer may not be held vicariously liable for punitive damages for the discrimination of managerial agents where that discrimination is contrary to the employer's good-faith efforts to comply with Title VII. See Kolstad, 527 U.S. at 545, 119 S.Ct. 2118; Gallina v. Mintz, 123 Fed.Appx. 558, 564 (4th Cir.2005). The failure to institute a written policy against sexual harassment figures prominently in determining the employer's liability. Harris, 132 F.3d at 983; see also Kolstad, 527 U.S. at 544, 119 S.Ct. 2118.
The majority's justification of punitive damages because Speedway's remedy "was both not prompt and/or inadequate" is not supported by federal and state law. Op. at 91. It appears the majority confuses the standard for liability for compensatory damages with that for the "extraordinary remedy" of punitive damages. Applying this standard would permit the imposition of punitive damages in most sexual harassment cases, regardless of the employer's good-faith attempt to comply with sexual harassment and without any affirmative showing of the employer's malice or reckless indifference to the plaintiff's federally protected rights. The majority's characterization of Speedway as "callously indifferent" does not transform its behavior into anything resembling the "subjective consciousness" of illegality, "criminal indifference to civil obligations," "evil intent," or "positive element of conscious wrongdoing" that constitutes "malice or reckless indifference" according to the Supreme *105 Court. See Kolstad, 527 U.S. at 536-38, 119 S.Ct. 2118 (discussing extensively the attitude an employer must have to justify imposition of punitive damages). An appellate court determining whether the award of punitive damages is consistent with governing law cannot rely upon the jury's verdict or a preference for liberal interpretation of sexual harassment law.

Conclusion
The cases requiring plaintiffs to meet their burden under sexual harassment statutes should not be construed to reflect a laissez-faire attitude toward sexual harassment or to require that women in the work force submit to sexual harassment as a condition of employment. They merely recognize that statutes prohibiting sexual discrimination were "designed to protect working women from the kind of male attentions that can make the workplace hellish for women[,] ... not designed to purge the workplace of vulgarity." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir.1995) (quoted in Anderson v. G.D.C., Inc., 281 F.3d 452, 459 (4th Cir.2002)); see also Gleason v. Mesirow Fin., 118 F.3d 1134, 1144 (7th Cir. 1997). "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace," and it does not impose employer liability for all verbal or physical harassment in the workplace. Hartsell, 123 F.3d at 773; Hilt-Dyson v. City of Chicago, 282 F.3d 456, 463 (7th Cir.2002). Sexual harassment law strikes a balance "between preventing workplace harassment and giving employers a reasonable opportunity to cure it." Carter v. Am. Online, Inc., 208 F.Supp.2d 1271, 1277 (M.D.Fla.2001). It is important to remember that Title VII's primary objective is prophylactic; "it aims, chiefly, `not to provide redress but to avoid harm.'" Kolstad, 527 U.S. at 545, 119 S.Ct. 2118 (quoting Faragher, 524 U.S. at 806, 118 S.Ct. 2275). With this in mind, while acknowledging that claims of employment discrimination are almost invariably fact-intensive, "motions for summary judgment... are appropriate to `police the baseline for hostile environment claims.'" Hipp, 252 F.3d at 1245 (quoting Mendoza, 195 F.3d at 1244).
This is such a case. Dupont clearly alleged harassing conduct, but not the kind of conduct actionable under Title VII or the Act. See Tuggle v. Mangan, 348 F.3d 714, 722 (8th Cir.2003). The conduct alleged did not transform the work environment into one so extreme as to change the terms of her employment such that Dupont was prevented from succeeding in the workplace. See id. In my opinion, Dupont did not meet the standards established by the Supreme Court that must be met "to clear the high threshold for actionable harm." See Tuggle, 348 F.3d at 722.
A claim for a sexually hostile working environment is not a trivial matter. Its purpose is to level the playing field for women who work by preventing others from impairing their ability to compete on an equal basis with men. One must always bear this ultimate goal in mind. A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace. Any lesser standard of liability, couched in terms of conduct that sporadically wounds or offends but does not hinder a female employee's performance, would not serve the goal of equality. In fact, a less onerous standard of liability would attempt to insulate women from everyday insults as if they remained models of Victorian reticence. A lesser standard of liability would mandate not equality but preference for women: it would create incentives for employers to bend *106 over backwards in women's favor for fear of lawsuits. Now that most American women are working outside the home, in a broad range of occupations and with ever-increasing responsibility, it seems perverse to claim that they need the protection of a preferential standard. The careful, heightened phrasing of a hostile environment claim, enforceable where working conditions have palpably deteriorated because of sexually hostile conduct, aims to enforce equality, not preference.
DeAngelis, 51 F.3d at 593.
Viewing Dupont's allegations in the most favorable light, Dupont did not establish conduct sufficiently severe or pervasive to create a hostile working environment, let alone to support the imposition of punitive damages. I would reverse and remand to the trial court with directions that it enter judgment in favor of Speedway.
NOTES
[1] Dupont brought this suit under the Florida Civil Rights Act, section 760.10, Florida Statutes (1998). She also alleged a claim for retaliation. The trial court granted a direct verdict for Speedway on that count, and Dupont has not cross-appealed.
[2] See Kitchen v. Ebonite Recreation Centers, Inc., 856 So.2d 1083 (Fla. 5th DCA 2003); Quilling v. County of Sumter, 726 So.2d 795 (Fla. 5th DCA 1999); Green v. CSX Transportation, Inc., 626 So.2d 974 (Fla. 1st DCA 1993).
[3] See North Shore Hospital, Inc. v. Barber, 143 So.2d 849 (Fla.1962); Vera v. Adeland, 881 So.2d 707, 710 (Fla. 3d DCA 2004).
[4] See Natson v. Eckerd Corp., Inc., 885 So.2d 945, 947 (Fla. 4th DCA 2004). Cf. Razner v. Wellington Regional Medical Center, Inc., 837 So.2d 437 (Fla. 4th DCA 2002); Castleberry v. Edward M. Chadbourne, Inc., 810 So.2d 1028 (Fla. 1st DCA 2002); Norton v. Leon County School Board, 2003 WL 21467095 (Fla.Cir.Ct. June 5, 2003).
[5] In the case of co-worker harassment, the employee must establish that the employer knew or should have known about the harassment and took no (or insufficient) remedial action.
[6] See Ellison v. Brady, 924 F.2d 872 (9th Cir.1991).
[7] Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir.2003).
[8] Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).
[9] Dupont's deposition was used effectively at trial to try to impeach some of her trial testimony. However, she explained that at the time she gave her deposition she was embarrassed and felt she was somehow at fault for Coryell's behavior, so she did not go into as much detail concerning his conduct towards her as she did at trial. She also pointed out that the attorney deposing her had not asked the specific questions she was called on to answer at trial. The jury was the proper entity to sort out her credibility, not a directed verdict or JNOV. This was not an extreme case where it appears the process of the trial was subverted with factual inconsistencies and false statements. See Cross v. Pumpco, Inc., 910 So.2d 324 (Fla. 4th DCA 2005).
[10] See Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir.2001).
[11] See, e.g., Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); Worth v. Tyer, 276 F.3d 249 (7th Cir.2001); Russell v. Midwest-Werner & Pfleiderer, Inc., 949 F.Supp. 792 (D.Kan. 1996).
[12] See Ortola v. Alfonso, 917 So.2d 252 (Fla. 3d DCA 2005).
[13] Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).
[14] See Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir.2001).
[15] Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
[16] Hall v. Gus Construction Co., Inc., 842 F.2d 1010, 1013 (8th Cir.1988).
[17] See Gupta v. Florida Board of Regents, 212 F.3d 571 (11th Cir.2000); Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir.1999).
[18] Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Swenson v. Potter, 271 F.3d 1184 (9th Cir. 2001); Johnson v. Booker T. Washington Broadcasting Service, Inc., 234 F.3d 501 (11th Cir.2000); Knabe v. Boury Corp., 114 F.3d 407 (3d Cir.1997); Ellison v. Brady, 924 F.2d 872 (9th Cir.1991). Cf. Dudley v. Wal-Mart Stores, Inc., 166 F.3d 1317 (11th Cir.1999); Degitz v. Southern Management Services, Inc., 996 F.Supp. 1451 (M.D.Fla.1998).
[19] Joshua v. City of Gainesville, 768 So.2d 432 (Fla.2000); Byrd v. Richardson-Greenshields Securities, Inc., 552 So.2d 1099, 1103 (Fla.1989); Green v. Burger King Corp., 728 So.2d 369, 371 (Fla. 3d DCA 1999). Cf. Irven v. Department of Health and Rehabilitative Services, 790 So.2d 403 (Fla.2001).
[20] Byrd v. Richardson-Greenshields Securities, Inc., 552 So.2d 1099 (Fla.1989).
[21] See Dees v. Johnson Controls World Services, Inc., 168 F.3d 417 (11th Cir.1999); Bouton v. BMW of North America, Inc., 29 F.3d 103 (3d Cir.1994).
[22] See Russell v. Midwest-Werner & Pfleiderer, Inc., 949 F.Supp. 792 (D.Kan.1996); Castleberry v. Edward M. Chadbourne, Inc., 810 So.2d 1028 (Fla. 1st DCA 2002).
[23] See Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir.2000); Natson v. Eckerd Corp., 885 So.2d 945 (Fla. 4th DCA 2004).
[24] See Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir.2000);
[25] Swenson v. Potter, 271 F.3d 1184 (9th Cir. 2001); Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir.1997).
[26] Swenson v. Potter, 271 F.3d 1184 (9th Cir. 2001).
[27] Swenson v. Potter, 271 F.3d 1184 (9th Cir. 2001).
[28] See Burns v. Windsor Ins. Co., 31 F.3d 1092 (11th Cir.1994); Butler v. Polk, 592 F.2d 1293 (5th Cir.1979); Tremblay v. Philip Morris, Inc., 231 F.Supp.2d 411 (D.N.H.2002).
[29] See Burns v. Windsor Ins. Co., 31 F.3d 1092 (11th Cir.1994); Watson v. ITT Sheraton Corp., 61 F.Supp.2d 529 (N.D.Miss.1997).
[30] See Stockett v. Tolin, 791 F.Supp. 1536 (S.D.Fla.1992).
[31] One pronouncement is puzzling: "Uninvited fondling or groping, as was established in this record, in other contexts constitutes actionable sexual battery, and clearly should not be tolerated in the work place." Op. at 84. I agree the conduct is intolerable, but is it "actionable sexual battery?" In Ortola v. Alfonso, 917 So.2d 252 (Fla. 3d DCA 2005), the court considered an injunction against repeat violence against a stalker who had groped the victim. It referred in passing to a previous groping, which was not described, as a "battery, or a `sexual assault,' as termed by the trial court." Ortola does not justify the majority's rhetoric, and the characterization of Coryell's conduct as "sexual battery" does not render Ferris applicable.
[32] In Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 747-49, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Supreme Court considered a quid pro quo case in which the employee endured several blatantly sexual advances by her supervisor. In Russell v. Midwest-Werner & Pfleiderer, 949 F.Supp. 792, 796 (D.Kan.1996), the supervisor, inter alia, frequently rubbed his groin against the employee and rubbed her back under her bra strap. In Worth v. Tyer, 276 F.3d 249, 257 (7th Cir.2001), the supervisor stroked his employee's face and put his hand down her shirt and on her breasts for several seconds.
[33] The court in Knabe v. Boury Corp., 114 F.3d 407 (3d Cir.1997), stated explicitly that it did not address whether the conduct was sufficiently "severe" or "pervasive" because there was no basis for employer liability. Id. at 411 n. 6; see also Woods v. Delta Beverage Group, Inc., 274 F.3d 295, 297-99 (5th Cir. 2001) (refusing to determine whether the behavior was severe or pervasive enough to establish liability, where the plaintiff claimed she was subjected to daily harassment, including frequent rubbing of her shoulders and neck, one kiss on her hand, and one touch of her hair, hand, and blouse).

The court in Swenson v. Potter, 271 F.3d 1184, 1196-97 (9th Cir.2001), did not focus on whether the alleged harassment was actionable; rather, it concluded that the employer's remedial action, taken after concluding that there was not enough evidence of sexual harassment, prevented the court from finding a basis for employer liability.
The other cases are inapposite because they involve either sexual innuendos demonstrating a disposition against women in the workplace, unwanted and repeated sexual advances, or both. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 19, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Ellison v. Brady, 924 F.2d 872, 873-74 (9th Cir.1991) (describing the coworker's repeated propositions and his increasingly disturbing love letters demonstrating his obsession for her); see also Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 508-09 (11th Cir.2000) (holding, in a closer case, that the harasser's unwanted sexual advances  repeated shoulder massages, lewd gestures, rubbing of his body parts against her, questioning about her sex life, and compliments about her voice and body  were frequent, severe, humiliating, and threatening).
Of Florida cases, Natson v. Eckerd Corp., Inc., 885 So.2d 945 (Fla. 4th DCA 2004), is potentially relevant. Natson, 885 So.2d at 946-47 (describing vaguely repeated inappropriate touchings, and the coworker's rubbing of the plaintiff's nipple). However, Coryell's conduct was not remotely "similar" to that in Russell v. KSL Hotel Corp., 887 So.2d 372 (Fla. 3d DCA 2004). See 887 So.2d at 378 (finding sexual harassment where coworker: expressed dissatisfaction that plaintiff was hired; kissed her upon introduction; constantly made kissing noises; rammed his erect penis against her buttocks and whispered, "F* *k you, Kitty, F* *k you"; cursed at her; asked another employee in her presence, "[H]ow many times should we f* *k her?" Should we call her husband? How many times can we "f* *k her?"; and punched her in the back).
[34] This element is also fact-intensive. The employer may still be entitled to summary judgment if harassment continues, but the employee does not report the further harassment; on the other hand, if the employer has made it obvious it has no real intention to stop harassment, the employee need not go through the wasted motion of another report. Woods, 274 F.3d at 299-301.
[35] The Florida Civil Rights Act, sections 760.01-.11, Florida Statutes (2004), was, before 1992, named the Florida Human Rights Act.
[36] See Joshua v. City of Gainesville, 768 So.2d 432, 435 (Fla.2000); Ranger Ins. Co. v. Bal Harbour Club, Inc., 549 So.2d 1005, 1009 (Fla.1989); Natson, 885 So.2d at 947; Guess v. City of Miramar, 889 So.2d 840, 846 n. 2 (Fla. 4th DCA 2004); Castleberry v. Chadbourne, Inc., 810 So.2d 1028, 1030 n. 3 (Fla. 1st DCA 2002); Florida St. Univ. v. Sondel, 685 So.2d 923, 925 n. 1 (Fla. 1st DCA 1996); Gray v. Russell Corp., 681 So.2d 310, 312 (Fla. 1st DCA 1996); see also Roy v. Broward Sheriff's Office, 160 Fed.Appx. 873, 875 (11th Cir.2005); Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir.1998); Carter v. Am. Online, Inc., 208 F.Supp.2d 1271, 1276 n. 3 (M.D.Fla.2001); Hipp v. Liberty Nat'l Life Ins. Co., 65 F.Supp.2d 1314, 1343 (M.D.Fla. 1999); Paris v. City of Coral Gables, 951 F.Supp. 1584, 1585 (S.D.Fla.1995); Kelly v. K.D. Constr. of Fla., Inc., 866 F.Supp. 1406, 1411 (S.D.Fla.1994).
[37] The portion quoted remains unchanged.